963 So.2d 1012 (2007)
STATE of Louisiana
v.
Voohries J. THERIOT.
No. 07-KA-71.
Court of Appeal of Louisiana, Fifth Circuit.
June 26, 2007.
*1014 John M. Crum, Jr., District Attorney, Fortieth Judicial District, Parish of St. John the Baptist, Edgard, Louisiana, Rodney A. Brignac, Leandre M. Millet, Assistant District Attorneys, LaPlace, Louisiana, for Plaintiff/Appellee.
Thomas C. Damico, Baton Rouge, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, CLARENCE E. McMANUS, and FREDERICKA HOMBERG WICKER.
MARION F. EDWARDS, Judge.
The defendant/appellant, Voohries J. Theriot ("Theriot"), appeals his conviction for the second degree murder of his son, Lawrence J. Theriot ("Lawrence"). Theriot was convicted after a two-day trial and was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. We affirm.
The day before trial, Theriot stipulated that he fired shots resulting in the death of Lawrence. On the first day of trial, the stipulation was read in court before the jury as follows:
It is hereby stipulated between the State of Louisiana and the defendant, Vohries [sic] J. Theriot, as follows: Defendant shot and killed Lawrence J. Theriot on September 1st, 2005 using a .22 caliber Colt Huntsman pistol taken into evidence, serial number 174171-C. At the trial of this matter the State shall not be required to produce expert testimony to establish the cause of death and that the projectiles causing death were discharged from the weapon described above or that the defendant fired said weapon causing the death of Lawrence J. Theriot.
At trial, Alvine Theriot ("Mrs. Theriot"), mother of the victim and Theriot's ex-wife, testified that, prior to Hurricane Katrina, she and Theriot (to whom she was married at the time of the killing) lived at the house with Lawrence, the victim and her only son. During Hurricane Katrina, her son took her to Baton Rouge, in part because he was afraid to leave her alone with Theriot. She subsequently returned home without her son. On September 1, 2005, her son called to check on the operation of the home's utilities and inquired why he had not received a cell phone call from his father about the utilities. He told Mrs. Theriot that he was coming home. She went into the mudroom in the back of the house and informed her husband about the conversation. Then, she asked Theriot why he had not called their son. At first, Theriot did not reply, but then he responded, "If he comes home and he tells me one word I'm going to shoot him," referring to the victim. She told her husband that he *1015 was talking like a "crazy man," and that he could not do that to their son because Lawrence just asked him to call as a favor. Mrs. Theriot admitted that, even though Theriot's statement bothered and concerned her, she did not call the police because she did not believe that he would kill their son. She also expected their son to come into the house first, as he normally did, when he arrived.
Mrs. Theriot went inside to lie down and wait for her son, and the next thing she heard was a single shot. She ran onto the back porch, saw her husband with a gun in his hand, and asked him what he was doing. Theriot replied, "I wanted to try the pistol to see if it works. . . . So I shot it on the concrete." When she asked him why he was testing the gun at that time, "he said because he wanted to see if it would work when he use [sic] it." When questioned about what Theriot meant by the statement, Mrs. Theriot responded, "What he said he was going to do." Mrs. Theriot did not call her son to tell him about his father having a gun. Instead, she returned to her room to await Lawrence, because she did not want to be in the mudroom with Theriot while he had a gun in his hand. The victim came home about 45 minutes later and, uncharacteristically, did not come in and greet her first, but went straight to the mudroom. Mrs. Theriot did not hear her husband and son talking, as she usually did. Rather, she immediately heard two gunshots and said to herself, "Oh, my God, he did it," as she ran to the back of the house. According to Mrs. Theriot, her son was shot "the minute he walked in." She found her son lying in the corner of the shower with his head in the corner on the wall. She screamed, "Vohries [sic], what in the world did you do?" Theriot responded, "I shot him."
Mrs. Theriot got down on the floor to comfort her son and as she asked him to get up, he was moaning and groaning. Theriot stood behind her with the gun still in his hand and directly over her head. She saw a bullet hole in her son's head and blood everywhere. Mrs. Theriot knew her son was dying and so did Theriot because in response to her actions, he said to her, "He's not going to get up. . . . He's dead. You can't get him up. . . . I shot him three times. I shot him three times in the head." Mrs. Theriot testified that her husband showed no remorse at all, and was not upset, did not cry, nor did he explain why he did it. Theriot just told her to go inside and call 911, but she refused to leave the victim. Ultimately, Theriot called 911. When the police arrived and she spoke to them, she was hysterical. In fact, an ambulance had to be called to take her to the hospital, because she could not stop crying and screaming. She denied telling the deputies that she knew her son had arrived and was outside with the defendant, or that the defendant came into her bedroom to tell her that he shot their son. If her husband and son talked after her return from Baton Rouge, Mrs. Theriot was not aware of it, and she never told any of the deputies that night that he did.
Detective Kenneth Mitchell ("Detective Mitchell") of the St. John the Baptist Sheriff's Office testified that when he arrived at the scene, he observed a white male lying in the doorway of the utility room with his feet inside a shower stall. The victim had sustained three gunshot wounds to his bodyone in the chest, one in the head, and one in his right hand. There had been necessary personnel on the scene prior to his arrival, including five police officers, a supervisor, the Acadian Ambulance service, and an assistant coroner. Detective Mitchell later learned that Mrs. Theriot, the victim's mother, had moved the body after she ran to the utility room upon hearing the gunshots. Detective Mitchell *1016 observed that in the shower stall there was a large pool of blood on the floor and blood spatter against the wall. Especially because there was no blood splatter and very little blood outside the stall, the detective opined that the victim had been shot while in the shower stall. However, he admitted that it was possible that the victim could have been shot outside the shower and then fallen into the stall. That scenario could have caused the right-side of the victim's head to hit the shower, which would have resulted in the pool of blood on the shower floor. However, based on his observations, it was his professional opinion the victim was in the shower stall when at least one of the fatal wounds was inflicted. Considering that the victim was approximately the same height as his father and the "projectory" of the head wound was almost to the top of the victim's head, that there was a bullet hole in the north wall of the shower, and that there was a defensive wound in the victim's hand, Detective Mitchell further opined that victim was in a crouched or lower position when he was shot.
Detective Mitchell attempted to interview Mrs. Theriot, but she was crying and upset, "very hysterical. She needed to be transported by ambulance to the hospital from the crime scene, because she was very nervous and out of control." Three weeks after the shooting, Detective Mitchell was able to obtain a statement from her. He reviewed the statement, which was not introduced into evidence but which does appear in the record, in court. There, Mrs. Theriot had stated that she knew her son had come home, because she saw his truck. She did not go outside because the victim was outside with his father, and she had no idea his father was going to shoot him.
On the day of the shooting, Detective Mitchell interviewed Theriot at the sheriff's office. As Detective Mitchell was completing an "Interrogation Advice of Right" form, Theriot blurted out, "I killed him." Detective Mitchell advised Theriot not to speak until he was advised of his rights. Nevertheless, as the detective was gathering other information to complete the form, Theriot stated, "I had to kill him, he swung at me, he didn't hit me but he swung at me." Detective Mitchell arrested Theriot after he completed the form. The detective opined that, during the interview, Theriot's voice was calm and normal, and he did not display any degree of emotion, remorse, or hysteria.
As part of the investigation, Detective Mitchell also interviewed Jason Blanchard ("Blanchard"), the Theriots' neighbor who called in the initial complaint. At trial, Blanchard testified that his home was situated directly behind the Theriots' house. On September 1, 2005, while he was barbecuing outside at approximately 4:00 p.m., Blanchard heard a man and a woman talking loud and animatedly. He noted that this had happened a lot in the past, so that he really did not pay that much attention. However, later that day, at approximately 8:00 or 9:00 p.m., he and a friend were outside when they heard a pop they did not recognize and then, after a couple of seconds, two more consecutive pops. Prior to these sounds, Blanchard did not hear anybody talking, arguing, or yelling. Blachard did not hear anyone or anything happening on the porch other than the three shots. Following those sounds, Blanchard heard the back door of the Theriot home open, and a woman say, "Where's Larry, what happened to Larry." In reply, he heard Theriot say, "He's dead, I shot him," in a monotone, matter of fact manner. According to Blanchard, Theriot did not sound angry or shocked, but rather calm. Blanchard and his friend called 911.
*1017 Dr. Collie Michael Trant ("Dr. Trant"), a forensic pathologist with the Lafayette Parish Corner's Office, testified that he performed the autopsy on Lawrence. The victim had gunshot wounds to his head, chest, and one hand, with the wounds to his head and chest being independently fatal. The gunshot to the head entered front to back and slightly right to left, in a slightly downward direction of approximately 10 degrees. Dr. Trant opined that the muzzle of the gun was at least two feet away when the victim was shot in the head, because there was no soot or stippling (marks caused by powder particles) on the wound. However, the soot without stippling found on the hand and chest wounds indicated that the gun was less than 12 inches from the victim when those shots were fired. A toxicology test run on the victim revealed that he had a normal therapeutic or prescribed level of hydrocodone in his blood, but this would not have altered his behavior. Additional toxicology tests were negative for illegal substances.
Michael Stephen Davis ("Davis"), a crime scene technician with the St. John Parish Sheriff's Office, testified that he was dispatched to the scene on the night of the incident. At the scene, he located evidence including a .22 caliber Colt Huntsman pistol from the utility room, along with a magazine that had been previously removed from the pistol by an officer, with seven live rounds in it. Davis also collected three casings in the utility room, two of which were recovered next to the victim's body and the third from underneath the body. In photographs taken by Davis, one photograph depicted the victim in the utility room doorway, and another depicted the doorway and part of the 3 foot by 3 foot shower stall. Other photographs submitted into evidence depicted casing number two near the shower stall, an inside shot of the shower stall plus the lower half of the victim's torso, and the victim's right hand with a wound to the palm area. The photograph of the victim's right hand and chest showed blackened areas around the wounds that Davis felt might indicate that the victim and the person who shot the gun were in close proximity when the shots were fired. Davis opined that one bullet caused the injury to the victim's right hand as it passed through, and then went into the wall of the shower stall. He agreed that the picture taken of the bullet hole in the shower wall indicated that it entered at an angle, but measurements were not taken either of the angle of the bullet's trajectory or of its exact location on the shower wall. Another of the photographs depicted a large pool of blood in the shower stall, which, in Davis' expert opinion, indicated that the victim was shot in there, even though other pictures of the victim's body depicted it outside the shower. Blood spatters were found in the stall two to four inches above the floor, indicating that the victim may have fallen all or partially out of the shower stall after being shot. Davis could not say if the victim's body, the gun, or the casings and shells had been moved prior to his taking the pictures, although patches depicted on the victim's right arm and leg may have indicated that ambulance personnel treated the victim or tried to get a pulse. Davis also admitted that he did not know the order in which the shots wounded the victim.
Dr. Andrew St. Martin ("Dr. Martin"), a family practice physician, testified that Theriot became his patient in 2003. Almost eight months before the shooting, Theriot sought treatment for a bruised rib. He told Dr. St. Martin that his son struck him in the left flank four days ago with a closed fist. Dr. St. Martin diagnosed and treated the defendant for a left lower chest contusion, although he testified that his physical examination could not determine *1018 with certainty whether someone struck Theriot. In addition, he noted no previous indication of prior injuries or pattern of contusions. Almost six months before the shooting, Dr. St. Martin diagnosed Theriot with anxiety and prescribed some medicine, but the physician did not determine a cause for the anxiety.
Roslyn Joseph ("Joseph") of the St. John the Baptist Clerk's Office testified that, in response to defense counsel's request, she obtained from the public records a certified copy of a petition for protective order and a protective order from abuse, in the case of "V.J. Theriot verses Lawrence Theriot," filed on January 26, 2005. The documents were not introduced into evidence but, according to the court minutes read into the record by Joseph, the protective order was dismissed with the proviso that Lawrence would "go get some help and may return home after he receive [sic] help."
Deputy Monica Swinney ("Deputy Swinney") of the St. John the Baptist Sheriff's Office testified that, at the scene of the shooting, Mrs. Theriot told her that Theriot loaded a gun and waited in the backyard after the victim telephoned. Mrs. Theriot stated that she heard two shots and then went outside to see her son. She did not mention hearing a practice shot. Mrs. Theriot also told the deputy that Theriot walked into her bedroom and told her to call the police, because he shot their son. Deputy Swinney admitted that Theriot was crying and upset when she spoke to her.

SUFFICIENCY OF THE EVIDENCE
On appeal, in addition to another trial error, Theriot argues that, based on the evidence provided by the State, the jury could not have found beyond a reasonable doubt that the he did not act in self-defense. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence.[1] Specifically, he contends that the State provided no direct evidence that addressed or disproved his self-defense claim and that no witnesses were called to testify about the events they observed as they happened. Theriot avers that Mrs. Theriot's testimony, provided by the State to show his pre-meditated intent, lacked credibility. He claims that she was confused about his response to the victim's telephone call, at first claiming that he did not say anything, then later claiming that he planned to shoot the victim. He points out that Mrs. Theriot did not mention the practice shot in her police statement. Regarding the practice shot, Theriot points out that Blanchard testified he heard nothing at least an hour before the shooting, until the three shots were fired. Theriot further urges that, instead of doing what a mother would do when he allegedly threatened to kill Lawrence, i.e. call the police or her son to warn him, Mrs. Theriot watched television. He contends that the contradictions in Mrs. Theriot's testimony should have raised questions about whether he ever made a threat against the victim's life.
In addition, Theriot argues that evidence provided by the various law enforcement officials failed to exclude all reasonable hypotheses of innocence by failing to exclude his claim that he fired the gun in self-defense. Theriot contends that no conclusions can be drawn based on the position of the body, because both Officer Davis and Detective Mitchell admitted that the body had been moved and, therefore, was not in its original position. Officer *1019 Davis failed to explain how the shower stall, and not the floor, was the only place a large amount of blood was found if the victim fell out of the shower immediately after being shot.
Finally, Theriot argues that the investigation was incomplete. He claims that the bullet was not removed from the shower wall, nor was its angle of entry measured. The crime scene investigators were confused about the hand in which the victim was shot, which was important because of the size of the room. He contends that the State's theory that the victim was cowering in the shower and shielding himself with his hand does not match with the wound in the victim's right hand and the position of the bullet hole in the shower stall wall. Theriot claims that the blood evidence is inconclusive. Officer Davis admitted that the defense theory that the victim was shot outside the shower and then fell in was logical and just as possible as the State's theory. Theriot argues that the positioning of the victim's body when shot is important, because if he was not shot in the shower there is nothing to indicate where he was in the room. Therefore, there is nothing to prove that Theriot did not act in self-defense. Theriot claims that his statement that he had to kill his son because he was attempting to hit him, Dr. Martin's testimony about his son's violent acts toward him, and his filing of a protective order establishes a reasonable hypotheses of self-defense.
The standard of review for determining the sufficiency of evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt.[2] The evidence may be either direct or circumstantial. The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. LSA-R.S. 15:438. In cases involving circumstantial evidence, the reviewing court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, the reviewing court must evaluate the evidence in the light most favorable to the prosecution and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia.[3]
Second degree murder is defined, in pertinent part, by LSA-R.S. 14:30.1 A(1) as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm. . . ." Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. The issue of specific intent is a question of fact.[4]
Theriot does not dispute that the State proved the elements of the offense. Rather, *1020 he claims that the killing was justified because it was committed in self-defense.
The determination of a defendant's culpability rests on a two-fold test: (1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger, and (2) whether deadly force was necessary to prevent the danger.[5] When a defendant claims self-defense, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense.[6] "[T]he lack of a weapon is not dispositive of the issue of self-defense, because it is the reasonableness of apprehension and not the actuality of danger that determines the question of self-defense."[7] While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger.[8] The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt.
In the present case, the jury was presented with two versions of the events on the day of the shooting. Theriot argued that he killed the victim in self-defense, claiming that the victim attempted to strike him immediately after arriving at his home. He presented evidence that the victim allegedly previously abused him through the testimony of Dr. St. Martin and Joseph. Theriot suggests that, because the victim previously abused him, he was in imminent fear of the loss of his life or of receiving great bodily harm.
The jury evidently found the State's version of events as presented by its witnesses more credible. According to Mrs. Theriot's testimony, Theriot expressed his intent to kill the victim and later test fired his gun to make sure it would work. Neither Mrs. Theriot, the only person in the house besides the victim and Theriot, nor Blanchard, heard any noise including talking, arguing, or fighting before the three shots were fired killing the victim. There was no evidence of any prior physical or verbal altercation between the victim and Theriot that night that might have caused Theriot to believe that he was in imminent danger so as to necessitate his shooting the victim three times and inflicting two mortal wounds. Mrs. Theriot testified that her husband stood behind her with the gun still in his hand and told her without remorse that their son was dead because he shot him.
The jury was made aware of any inconsistencies in Mrs. Theriot's statements to the deputies and her trial testimony and could have reasonably determined that these inconsistencies were a result of her grief. The jury chose to believe Mrs. Theriot's trial testimony concerning her husband's statements and actions before or after he shot their son. The jury also had the benefit of the testimony and forensic evidence provided by Davis and Detective Mitchell, who both opined that the victim was shot while he was in the shower. The shots were fired into the victim's head and chest from a distance of two feet or less, *1021 and Detective Mitchell opined that the victim was in a crouched position when he was shot, using his right hand to shield himself.
It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence.[9] When presented with all the evidence, the jury could have reasonably determined that Theriot did not have a reasonable belief that he was in imminent danger and could have found beyond a reasonable doubt that Theriot had the specific intent to kill his son.
This assignment of error is without merit.

IMPROPER COMMENT BY DISTRICT ATTORNEY
Theriot also argues that the trial court erred by failing to grant a mistrial based on a comment made by the district attorney during rebuttal. Theriot urges that the comment was impermissible as an indirect reference to his failure to testify and, thus, a mistrial was mandated.
In its closing argument, defense counsel reminded the jury that the State has the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense and that the State never met its burden of proof. Defense counsel reminded the jury that the State had not met its burden to explain why the shooting happened, stating "[the district attorney] doesn't know what happened in that room. We don't know what happened in that room. And it's his job to tell us that whatever happened in that room wasn't self-defense." The defense argued that Mrs. Theriot did not know what happened in the utility room. Counsel contended that Theriot had to kill the victim, as he told Detective Mitchell, because Lawrence was swinging and hitting at him. According to defense counsel, the evidence showed that Theriot feared the victim, because the victim hit him on at least one occasion, which required medical attention. Counsel suggested that, if Theriot had not killed the victim, then the victim would have killed him.
In his rebuttal argument, the district attorney remarked:
Counsel is correct. He says we don't know what happened in that room, nobody was there. Well, I mean, there were two people in that room. There were two people that knew what happened in that room. Larry Theriot was one of them and he couldn't testify today thanks to what his father did to him. So, I'm sorry if I can't produce direct evidence.
During the bench conference, after the jury was retired, defense counsel objected, stating that the district attorney could not comment on Theriot's decision not to testify. The district attorney replied that the comment was not directed at Theriot's lack of testimony, but, rather, "I said there were two people that knew what went on in that room and one of them is dead. I didn't say anything about testifying." The trial judge denied the defense motion for a mistrial.
"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the . . . district attorney . . . in argument, refers directly or indirectly to . . . [t]he failure of the defendant to testify in his own defense[.]" LSA-C.Cr.P. art. 770(3). When a direct reference is made by the State regarding the defendant's failure to take the stand, a *1022 mistrial should be declared regardless of whether the State intended for the jury to draw unfavorable inferences from the defendant's silence.[10] However, when the State makes an indirect reference to the defendant's failure to testify, the trial court must determine whether the remark's intended effect on the jury was an impermissible reference to the defendant's failure to testify or a permissible reference in a general statement that the State's case was unrebutted.[11] An indirect reference only requires a mistrial if the comment was intended to draw the jury's attention to the defendant's failure to testify.[12] Indirect references which are intended to focus on a defendant's failure to testify are those cases where the defendant is the only witness who can rebut the state's evidence.[13]
In cases where the prosecutor simply emphasized that the state's evidence was unrebutted, and there were witnesses other than the defendant who could have testified on behalf of the defense but did not do so, we have held that the prosecutor's argument did not constitute an indirect reference to the defendant's failure to take the stand. . . .
On the other hand, where the defendant is the only witness who could have rebutted the state's evidence, "a reference to the testimony as uncontroverted focuses the jury's attention on the defendant's failure to testify" and mandates a mistrial. . . . [14]
In the present case, our inquiry compels us to find that the prosecutor's remark was impermissible. What began as a comment on the defense's case culminated in an unmistakable focus on Theriot's failure to testify because, as the State pointed out, Theriot was the only witness who could rebut the State's evidence. Therefore, we find the court erred in failing to declare a mistrial. However, our inquiry does not end there.
As a matter of Louisiana law, the mandatory mistrial provisions of LSA-C.Cr.P. art. 770, which encompass a prosecutor's direct or indirect comment on the defendant's failure to testify, are directives to the trial judge and do not preclude an appellate court from conducting harmless-error analysis.[15]
A conviction will not be reversed due to improper remarks during closing argument unless the reviewing court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict.[16] In making its determination, the appellate court should give credit the good sense and fairmindedness of the jury that has seen the evidence and heard the argument, and has been instructed that the arguments of counsel are not evidence.[17]
Our review convinces us that the guilty verdict was not attributable to the prosecutor's remark but, rather, to the evidence presented at trial. Theriot vowed to kill his son, test fired the weapon he ultimately *1023 used, and shot three times, inflicting two mortal wounds. There was more than sufficient evidence to convict Theriot of second degree murder. This assignment of error is without merit.
We have conducted an error patent review and find none.
AFFIRMED.
NOTES
[1] State v. Hearold, 603 So.2d 731, 734 (La. 1992).
[2] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[3] State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
[4] State v. Johnson, 01-1362 (La.App. 5 Cir. 5/29/02), 820 So.2d 604, writ denied, 2002-2200 (La.3/14/03), 839 So.2d 32.
[5] State v. Johnson, supra.
[6] State v. Garcia, 483 So.2d 953, 956 (La. 1986); State v. Barnes, 98-932 (La.App. 5 Cir.2/10/99), 729 So.2d 44, 46, writs denied, 99-1018 (La.9/17/99), 747 So.2d 1099, 01-0519 (La.10/12/01), 799 So.2d 499.
[7] State v. Patorno, 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 148. See also, State v. Griffin, 2006-543 (La.App. 3 Cir. 9/27/06), 940 So.2d 845.
[8] State v. Barnes, supra.
[9] State v. Styles, 96-897 (La.App. 5 Cir.3/25/97), 692 So.2d 1222, 1233, writs denied, 97-1069 (La.10/13/97), 703 So.2d 609, 00-3460 (La.10/12/01), 799 So.2d 496.
[10] State v. Mims, 00-1507 (La.App. 5 Cir. 12/26/01), 806 So.2d 760, 764, writ denied, 02-0466 (La.2/7/03), 836 So.2d 88.
[11] Id.
[12] State v. Lai, 04-1053, p. 7 (La.App. 5 Cir. 4/26/05), 902 So.2d 550, 560, writ denied, 05-1681 (La.2/3/06), 922 So.2d 1175.
[13] State v. Mims, supra.
[14] State v. Lai, supra (citing State v. Johnson, 541 So.2d 818, 822 (La.1989)).
[15] State v. Thomas, 2005-2373 (La.4/17/06), 926 So.2d 490.
[16] State v. Jackson, 04-293, p. 4 (La.App. 5 Cir. 7/27/04), 880 So.2d 69, 73, writ denied, 05-0232 (La.5/6/05), 901 So.2d 1094.
[17] Id.