SUSAN M. CHEHARDY, Judge.
 

 |2On September 26, 2006, the Jefferson Parish Grand Jury indicted defendant, Alvin C. Hyman, on one count of second degree murder, in violation of La. R.S. 14:30.1. Defendant pled not guilty at arraignment.
 

 Defendant was tried by a twelve-person jury on January 13, 14, and 15, 2009. The jury returned a verdict of guilty of the lesser-included charge of manslaughter, a violation of La. R.S. 14:31. On March 6, 2009, the trial court sentenced defendant to 40 years at hard labor. Defendant filed a motion to reconsider sentence, which the court denied. Thereafter, defendant filed a timely motion for appeal, which the trial court granted on March 6, 2009.
 
 [1]
 

 Facts
 

 In the early morning hours of August 6, 2006, Leslie Daigrepont was at Alvin C. “Chris” Hyman’s apartment when Mr. Hy-man accused her of stealing narcotics and money from him. According to Mrs. Daig-repont, Mr. Hyman grabbed her by the throat, threw her to the floor, and attempted to “strip search” | ¡¡her. Mrs. Daigre-pont escaped the apartment when someone unexpectedly knocked at Mr. Hyman’s front door.
 

 When she returned to her house, Mrs. Daigrepont described the confrontation to her husband, Joshua Daigrepont, and, her brother, Dirk Guidry. Although Mrs. Daigrepont denied Mr. Hyman’s accusations while he was questioning her, she admitted to her husband and brother that she had, in fact, stolen narcotics and money from Mr. Hyman earlier that morning.
 

 Later that morning, Mrs. Daigrepont was speaking on the telephone with Leslie Boyer, Mr. Hyman’s girlfriend, when Mr. Hyman commandeered the telephone to tell Mrs. Daigrepont that she and her family were “dead.” Mrs. Daigrepont’s brother, Dirk Guidry, then informed Mr. Hy-man that he was coming to Hyman’s apartment to “beat his ass.” Mr. Hyman accepted the challenge, agreeing to meet Mr. Guidry there. Mr. Guidry and Mr. Daigrepont then drove to Mr. Hyman’s residence. Mrs. Daigrepont did not go with her husband and brother.
 

 Joshua Daigrepont confirmed that his wife told him about her confrontation with Hyman. He verified that his wife was
 
 *275
 
 talking with Ms. Boyer on the telephone when Hyman threatened his wife and her family. Mr. Daigrepont confirmed that his brother-in-law, Mr. Guidry, retorted that he would be waiting at Hyman’s house for him.
 

 Mr. Daigrepont then drove with Mr. Guidry to Hyman’s house at about 9:00 a.m. They knocked on the door of Mr. Hyman’s second floor apartment and shouted for him to open the door. When they received no response, Mr. Daigrepont and Mr. Guidry went downstairs to Shara-mie Brewer’s apartment, where they waited for about 20 to 30 minutes. As they were leaving Ms. Brewer’s apartment, Hy-man arrived at the apartment complex.
 

 |4When Mr. Hyman exited the passenger side of the car, he was holding a gun. Mr. Daigrepont saw the weapon and ducked between parked cars, but Mr. Guidry began yelling at Mr. Hyman.
 

 Mr. Daigrepont testified that Mr. Hy-man then raised the gun and pulled the trigger twice, but the weapon failed to discharge. Next, Mr. Hyman turned toward the car and asked an occupant whether there were any bullets in the gun. Hyman then turned back toward Guidry and fired a shot. Immediately, Hyman got back into the car.
 

 Mr. Daigrepont testified that, after Mr. Hyman was in the vehicle, he fired a shot through the car’s window at Mr. Daigre-pont, who was crouched between parked cars. Mr. Daigrepont was unharmed.
 

 Sharamie Brewer witnessed the shooting from the window of her apartment at 126 Athania Parkway. She heard Mr. Gui-dry and Mr. Hyman arguing in the parking lot of her apartment complex but she could not make out what they were saying. She saw Mr. Hyman get out of a car, point a gun, and shoot Mr. Guidry.
 

 Debbie Dawson testified that, on August 6, 2006, she lived at 124 Athania Parkway. She knew Mr. Hyman, who lived in the next building at 126 Athania Parkway. At 5:30 a.m. that morning, Ms. Dawson heard loud voices emanating from Mr. Hyman’s building but she could not hear what the man and the woman were saying.
 

 Later that morning, Ms. Dawson saw two men, who she did not know, waiting in front of Mr. Hyman’s building. She overheard the men talking angrily about a confrontation between Mr. Hyman and the sister of one of the men. Ms. Dawson assumed the fight to which the men were referring was the argument she had heard earlier that morning.
 

 | ¡jShortly thereafter, Ms. Dawson, from her second floor bedroom window, saw Mr. Hyman arrive at his apartment complex. He was riding in the passenger seat of a car, other than the one that he usually drove. Mr. Hyman exited the vehicle with a gun in his hand and started shouting at the two men. He challenged the men to “come over here” and to “handle this like a man.”
 

 Mr. Hyman then pointed the gun at Mr. Guidry. Ms. Dawson heard the gun click two times then fire. Mr. Guidry fell to the ground immediately. Ms. Dawson called 9-1-1 to report the shooting then attempted to render assistance. Ms. Dawson testified that the altercation happened in less than two minutes.
 

 Devin Doran, who was incarcerated on an unrelated charge at the time of trial, testified that she had known Alvin Hyman for a couple of months before the shooting. On the morning of August 6, 2006, Ms. Doran and her male friend, Tracy, ran into Mr. Hyman as he left a bar. He asked them for a ride home so they drove him to his apartment building. When they arrived, two men were standing in front of the building. Neither of those men had a
 
 *276
 
 gun. To her and Tracy’s shock, Mr. Hy-man got out of the car and shot the “little dude.” Mr. Hyman re-entered the car, and told Tracy to drive him to another place, which Tracy did. Ms. Doran testified that she had no further contact with Mr. Hyman.
 

 Leslie Daigrepont, Joshua Daigrepont, Leslie Boyer, Sharamie Brewer, Debbie Dawson, and Devin Doran viewed a photographic lineup provided by the Jefferson Parish Sheriffs Office at separate times. After viewing the lineup, each witness identified defendant, Alvin “Chris” Hyman, as the shooter.
 

 Once Mr. Hyman was identified as a suspect, Deputy Verloin Degruy of the Jefferson Parish Sheriffs Office worked with defendant’s cellular telephone company to locate his phone by using a global positioning system (GPS). That | (¡information allowed Detective Gorumba to narrow his search for Mr. Hyman to the residence of Mary Spaulding on Elizabeth Avenue.
 

 When the police arrived, Ms. Spaulding gave written consent for police to search her house. The officers located defendant in the rear bathroom and arrested him immediately.
 

 At trial, Mary Spaulding testified that defendant called her that day asking her to pick him up from somewhere in New Orleans. When she picked Hyman up, he was wearing a hat and a wig. Defendant admitted that he shot Mr. Guidry but told Ms. Spaulding that Guidry had pulled a gun on him and was going to shoot him. During the search of Spaulding’s house, Detective Gorumba recovered a brown wig.
 

 Several police officers involved in the homicide investigation testified for the State at trial. Sergeant Billy Lewis identified a tape recording of the 9-1-1 call associated with the homicide. The recording was played for the jury. Sergeant Lewis verified that the call was initiated at 8:42 a.m., and the first police unit arrived at the scene at
 
 8:47
 
 a.m.
 

 Detective Timothy Anclade was a patrolman with the Jefferson Parish Sheriffs Office on August 6, 2006, who was dispatched to 126 Athania in Metairie at 8:44 a.m. on that date. When he arrived at the scene five minutes later, he found a white man lying on his back in the parking lot. Detective Anclade secured the scene. Next, he interviewed a witness who said a vehicle pulled up, someone exited the vehicle, shot the victim, and left in the same vehicle. The witness gave Anclade the shooter’s name, which Anclade passed on to the homicide division.
 

 On August 6, 2006, Captain Steve Buras was assigned to the Persons Division, which investigates homicides, robberies, and rapes. At the crime scene, Captain Buras recovered a spent .9 mm cartridge casing in the parking lot, 45 to 50 |7feet south of where the body was discovered, and a cellular telephone and a baseball cap.
 

 Sergeant Donald Meunier, a homicide investigator, walked the perimeter of the murder scene and found no other ballistic evidence. Detective Meunier prepared a search warrant for defendant’s apartment at 126 Athania Parkway, Apartment C. However, no firearms were recovered.
 

 Dr. Fraser Mackenzie, an expert in pathology and forensic pathology, performed an autopsy on Dirk Guidry’s body. Dr. Mackenzie determined that Dirk Guidry’s death was a homicide caused by a gunshot wound to the chest that perforated the left lung and heart and lodged in the victim’s back. Dr. Mackenzie recovered the bullet and turned it over to a Jefferson Parish Crime Scene technician.
 

 
 *277
 
 Captain Tim Scanlan, the assistant director of the Jefferson Parish Sheriffs Office Crime Lab, is an expert in tool mark examination, crime scene reconstruction, trace analysis, forensic science, and crime scene processing. He examined the lead projectile recovered from the victim and the spent bullet casing. He determined that the projectile had a lead core that was consistent with .38 caliber class ammunition and the spent casing was consistent with the same class of ammunition.
 

 Furthermore, Captain Scanlan testified that a gunshot residue test was performed on the victim’s hands in order to determine whether he had handled or discharged a gun. The test produced a negative result. Toxicology tests of Dirk Guidry’s blood revealed marijuana, cocaine, morphine, hy-drocodone, and 6-0-monoacetylmorphine.
 

 At trial, defendant called Leslie Boyer to testify. Ms. Boyer testified that she had known Dirk Guidry since high school. On the morning of the shooting, |sshe was involved in telephone conversations with Alvin Hyman, Leslie Daigrepont, and Dirk Guidry. Ms. Boyer testified that Mr. Hy-man did not threaten Mrs. Daigrepont or her family during those conversations. Further, Ms. Boyer initiated a three-way call between Mr. Hyman and Mr. Guidry. According to Ms. Boyer, during that conversation, Mr. Guidry informed them that he was waiting at Hyman’s house with a gun. Ms. Boyer also reported that, according to Mr. Hyman, while they were arguing in front of his house, he saw Mr. Guidry lift his shirt and thought Mr. Gui-dry was pulling a gun from his waistband.
 

 Edward “Eddie” Guy, a licensed investigator, also testified on defendant’s behalf. He stated that he went to the scene to measure pertinent distances. Mr. Guy noted that there is a dumpster next to the driveway of the apartment complexes that would have obscured the view of the murder scene from Sharamie Brewer’s first floor apartment.
 

 Based on the testimony and evidence, the twelve-person jury found defendant guilty of manslaughter. Defendant appeals his conviction and sentence and assigns seven assignments of error for our review.
 

 In defendant’s fourth and fifth assignments of error, he challenges the sufficiency of evidence: the verdict of manslaughter is contrary to the law and the evidence and the district court erred in denying defendant’s motion for post-verdict judgment of acquittal. When issues are raised on appeal as to sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine sufficiency of the evidence.
 
 State v. Hearold,
 
 603 So.2d 731, 734 (La. 1992);
 
 State v. Guillard,
 
 04-899 (La.App. 5 Cir. 4/26/05), 902 So.2d 1061, 1070,
 
 writ denied,
 
 05-1381 (La.1/13/06), 920 So.2d 233. When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is ^insufficient to support the conviction, the accused must be discharged as to that crime, and any issues regarding trial errors become moot.
 
 Id.
 

 The constitutional standard for testing the sufficiency of evidence, as enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier-of-fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. The question of sufficiency of the evidence is properly raised in a motion for post-verdict judgment of acquittal.
 
 State v. Pearson,
 
 07-332, p. 12 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 653.
 

 
 *278
 
 In this case, defendant was convicted of manslaughter under La. R.S. 14:31. La. R.S. 14:31(A)(1) provides, in pertinent part, that manslaughter is:
 

 A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.
 

 On appeal, defendant does not deny that he shot Dirk Guidry, but insists that he acted in self-defense. Accordingly, defendant does not argue that the State failed to prove the elements of manslaughter but he maintains that the prosecution failed to prove, beyond a reasonable doubt, that the homicide was not in self-defense.
 

 When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense.
 
 State v. Brown,
 
 414 So.2d 726, 728 (La.1982);
 
 State v. Theriot,
 
 07-71, p. 13 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020,
 
 writ denied,
 
 07-1598 (La.2/1/08), 976 So.2d 715. According to La. R.S. 14:20(1), a homicide is | ^justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.”
 

 The determination of a defendant’s culpability rests on a two-fold test: 1) whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and- 2) whether deadly force was necessary to prevent the danger.
 
 Theriot,
 
 07-71 at 12, 963 So.2d at 1020. “ ‘[T]he lack of a weapon is not dispositive of the issue of self-defense, because it is the reasonableness of the apprehension and not the actuality of danger that determines the question of self-defense under La. R.S. 14:20.’ ”
 
 Theriot, supra,
 
 quoting
 
 State v. Patorno,
 
 01-2585, p. 11 (La.App. 1 Cir. 6/21/02), 822 So.2d 141,148.
 

 The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt.
 
 Theriot, supra.
 
 The trier-of-fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness.
 
 State v. Singleton,
 
 05-622, p. 7 (La.App. 5 Cir. 1/31/06), 922 So.2d 647, 651. It is not the function of the appellate court to assess the credibility determinations of the trier of fact or to reweigh the evidence.
 
 Id.
 

 In the instant case, defendant offered Leslie Boyer’s testimony to show that he did not threaten Mr. Guidry or the Daigre-ponts over the telephone but that the victim actually threatened him. On cross-examination, however, Ms. Boyer admitted that she told police she heard defendant tell Mrs. Daigrepont, “ ‘I’m going to get you, b* * *h. I’m going to get you, you wait and see. You stole my coke.’ ”
 
 [2]
 

 Conversely, Mrs. Daigrepont stated that, while they were on the telephone, she did not hear Mr. Guidry say anything to defendant about a weapon. Joshua I nDaigrepont testified that he did not hear
 
 *279
 
 Mr. Guidry say anything to defendant over the telephone about a gun.
 

 Mr. Daigrepont further testified that Mr. Guidry did not bring a gun to Mr. Hyman’s apartment. Daigrepont testified that Mr. Guidry did not have a gun at all on the day of the incident. Furthermore, Mr. Daigrepont did not see a gun anywhere around Mr. Guidry after he was shot. He reiterated that he and Mr. Gui-dry planned only to fist-fight with defendant that day.
 

 As defendant points out, both Mr. and Mrs. Daigrepont have criminal records and asserts that the couple’s testimony was unreliable, and not believable. As this Court has noted many times, however, questions of credibility are within the purview of the jury and it is not our function to assess the credibility determinations of the trier of fact or to reweigh the evidence.
 
 State v. Singleton, supra.
 

 Furthermore, even if the jury did not rely on the Daigreponts’ testimony, there were at least three other witnesses whose testimony disproved defendant’s self-defense claim. Devin Doran, who drove defendant to the scene of the shooting, testified that no words were exchanged between defendant and the two men that were waiting for him at his apartment complex; defendant simply got out of her ear and shot one of the man. Ms. Doran did not see either the victim or the other man holding a gun, and defendant did not tell her that either of the men had a gun.
 

 Sharamie Brewer, who witnessed the shooting from her apartment window, testified that she did not see Mr. Guidry or Mr. Daigrepont with a gun when they were waiting for defendant near her apartment. She also testified that she did not see Dirk Guidry with a firearm at the time of the shooting.
 

 112Pebbie Dawson also witnessed the shooting from her nearby apartment. Pri- or to defendant’s arrival at the scene, Ms. Dawson heard Mr. Guidry and Mr. Daigre-pont talking. They appeared to be angry about the confrontation between defendant and Mrs. Daigrepont. Nevertheless, when defendant arrived in the parking lot, he was the one who acted in a confrontational manner. According to Ms. Dawson, defendant shouted at Guidry and Daigrepont to “come over here” and “handle this like a man.” Ms. Dawson testified that defendant pointed his gun at Mr. Guidry and pulled the trigger twice before it actually fired, which incidentally specifically corroborates Mr. Daigrepont’s testimony.
 

 Ms. Dawson stated that she did not see Mr. Guidry or Mr. Daigrepont -with a gun that morning. Moreover, when Ms. Dawson attempted to give Mr. Guidry medical assistance after the shooting, she did not see a gun near his body.
 

 Detective Anclade, the first police officer to arrive at the scene, testified he did not see a weapon on or near the victim’s body. Finally, none of the witnesses testified that Mr. Guidry attempted to attack defendant.
 

 Based the foregoing testimony, we find that the State met its burden of proving, beyond a reasonable doubt, that defendant did not act in self-defense. Accordingly, we find no merit in these assignments of error.
 

 Upon finding that the conviction was based upon sufficient evidence to prove that defendant was guilty, beyond a reasonable doubt, of manslaughter, we return to defendant’s first and second assignments of error: first, the “prosecution did not comply with its discovery requirements as it applies to the exculpatory/impeachment information prior to trial,” and second, “the district court did err in the denial of the motion for new trial.”
 

 
 *280
 
 In these two assignments, defendant argues that his due process rights were violated by the State’s failure to provide to him before his trial exculpatory 113evidence regarding Joshua Daigrepont’s prior guilty pleas and the trial court erred in denying his motion for new trial based on this issue. Specifically, defendant complains the State did not inform him that: (1) Mr. Daigrepont had a felony charge nolle prossed in December of 2008; and (2) Mr. Daigrepont pled guilty to possession of heroin and felony theft in December, 2008 with the State’s assurance that he would not be multiple billed for either conviction.
 

 On appeal, defendant further complains that the State allowed Joshua Daigrepont to give perjured testimony regarding his criminal history without correction. The State responds that it made its entire file available to the defense prior to trial, and that it made the defense aware of Mr. Daigrepont’s criminal record. The State further noted that documentation of Mr. Daigrepont’s criminal record was available to the defense with or without the State’s involvement. Finally, the State presented testimony from the prosecutor in charge of the cases that led to Daigrepont’s 2008 guilty pleas, who confirmed that he did not make a deal with Daigrepont in exchange for his testimony in this matter.
 

 In
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the suppression by the prosecution of evidence favorable to the accused after receiving a request for it violates a defendant’s due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution.
 
 Id.,
 
 373 U.S. at 87, 83 S.Ct. at 1196-97. The
 
 Brady
 
 rule includes evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may be determinative of guilt or innocence.
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985);
 
 Giglio v. United States,
 
 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972);
 
 State v. Knapper,
 
 579 So.2d 956, 959 (La.1991).
 

 114Regardless of whether there is a request, favorable evidence is material, and constitutional error results from its suppression by the government, “if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.”
 
 Kyles v. Whitley,
 
 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (citing
 
 Bagley,
 
 473 U.S. at 682, 105 S.Ct. at 3383).
 
 Bagley
 
 ⅛ touchstone of materiality is a “reasonable probability” of a different result.
 

 The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether, in its absence, he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A “reasonable probability” of a different result is shown when the State’s evidentia-ry suppression “undermines confidence in the outcome of the trial.”
 
 Kyles,
 
 514 U.S. at 434, 115 S.Ct. at 1566;
 
 Bagley,
 
 473 U.S. at 678, 105 S.Ct. at 3381.
 

 Here, in his pre-trial motions, defendant requested exculpatory evidence from the State. In response, the State provided the defense with information regarding Mr. Daigrepont’s (and other witnesses) criminal history. Specifically, the State reported, “Mr. Daigrepont was not offered any plea bargain in exchange for his testimony in this case.”
 

 At trial, Joshua Daigrepont testified that he was currently serving a four-year sentence for (1) possession of heroin, (2)
 
 *281
 
 felony theft, (3) resisting arrest, and (4) possession of drug paraphernalia. Mr. Daigrepont testified that the instant resisting arrest conviction resulted from the original 2006 simple escape charge. He also admitted that he had a 1995 conviction for possession with intent to distribute marijuana.
 

 | lsOn cross-examination, Mr. Daigrepont further admitted to convictions for (1) disturbing the peace in 1995 and (2) a marijuana charge involving Dirk Guidry in 1995. When questioned about the felony theft charge to which he pled guilty a month prior to the instant trial, Mr. Daig-repont testified that he had received a two-year sentence for that offense, and that he was not multiple billed.
 

 At the conclusion of Mr. Daigrepont’s testimony, defense counsel moved for a mistrial. Counsel argued that he had specifically asked the State about any deals made with witnesses for their testimony, and the State misinformed him because, in December 2008, Mr. Daigrepont had not been multiple-billed on his theft or heroin charges and a felony escape charge against him had been nolle prossed.
 

 The prosecutor responded that he provided defense counsel with Mr. Daigre-pont’s local, state, and FBI “rap sheets” and Mr. Daigrepont’s recent guilty pleas to possession of heroin, possession of drug paraphernalia, and theft of goods. The prosecutor reiterated that Mr. Daigrepont had not been offered any plea bargains in exchange for his testimony at the murder trial.
 

 Furthermore, Jeff Hand, a former Jefferson Parish Assistant District Attorney, testified thereafter that he was the assistant district attorney involved in Mr. Daig-repont’s most recent guilty pleas. He stated that he chose not to multiple-bill Mr. Daigrepont because the previous felonies were almost ten years old and the district attorney’s office must use its discretion in order to move cases. Mr. Hand stated that Mr. Daigrepont’s guilty pleas were not associated with the murder case. Had that been the case, he would not have allowed Mr. Daigrepont to plead guilty and be sentenced before he had testified in this case. Furthermore, he understood that because Mr. Daigrepont was related to the victim in the murder case, he would have a compelling reason to testify without the offer of a deal from [ 1Bthe State. The trial judge denied defendant’s motion for mistrial and subsequent motion for new trial on this basis.
 

 Here, we find that the State adequately complied with the requirements of
 
 Brady.
 
 First, the record reveals that the State turned over the criminal histories requested by the defense, including Mr. Daigrepont’s latest guilty pleas. Second, as defense counsel demonstrated at trial, further information on the State’s witnesses was readily available from the Jefferson Parish Clerk of Court.
 
 [3]
 
 Third, the former prosecutor testified that he did not make a deal with Mr. Daigrepont in exchange for testimony in this case; he chose not to multiple bill Mr. Daigrepont for reasons unrelated to this case. Finally, defense counsel, in an attempt to discredit Mr. Daigrepont, thoroughly cross-
 
 *282
 
 examined him about his prior convictions and any deals that he could have made with the State. Upon review, we find that the trial judge did not err in denying defendant’s motion for mistrial or motion for new trial.
 

 On appeal, defendant further argues that his conviction should be reversed under
 
 Napue v. Illinois,
 
 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), because the prosecutor allowed Mr. Daigrepont, a key State witness, to give perjured testimony at trial without correction. The State argues that defendant failed to preserve the perjury issue for appeal, since he failed to raise it at trial.
 
 See, State v. Singleton,
 
 05-634, pp. 9-10 (La.App. 5 Cir. 2/14/06), 923 So.2d 803, 809,
 
 writ denied,
 
 06-1208 (La.11/17/06), 942 So.2d 532; La. C.Cr.P. art. 841.
 

 We agree. Furthermore, even if we were to address the merits of defendant’s argument, we find no error. The Louisiana Supreme Court described the provisions of
 
 Napue
 
 as follows:
 

 | 17To prove a
 
 Napue
 
 claim, the accused must show that the prosecutor acted in collusion with the witness to facilitate false testimony. When a prosecutor allows a state witness to give false testimony without correction, a conviction gained as a result of that perjured testimony must be reversed, if the witness’s testimony reasonably could have affected the jury’s verdict, even though the testimony may be relevant only to the credibility of the witness.
 
 Id.
 
 at 269, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217. Furthermore, fundamental fairness to an accused, i.e., due process, is offended “when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.”
 
 Id.
 
 When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial.
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 

 State v. Broadway,
 
 96-2659, p. 17 (La.10/19/99), 753 So.2d 801, 814,
 
 cert. denied,
 
 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000).
 

 Here, we cannot say that Mr. Daigre-pont gave false testimony regarding his criminal record. He admitted to numerous prior convictions when questioned by the prosecutor and defense counsel. Furthermore, the record is devoid of any mention of collusion between the State and Mr. Daigrepont regarding any issue, including his criminal record. If this issue had been preserved, it would have no merit.
 

 In his next assignment of error, defendant argues that the trial judge erred in denying a mistrial because, during trial, the State improperly introduced “other crimes” evidence without proper notice under
 
 State v. Prieur,
 
 277 So.2d 126, 130 (La.1973).
 
 [4]
 
 Here, defendant refers to Les
 
 *283
 
 lie Daigrepont’s testimony that | ^defendant used physical violence against her on the morning of the shooting. The State contends the evidence complained of was properly admitted as
 
 res gestae.
 

 During Mrs. Daigrepont’s trial testimony, defense counsel objected and moved for a mistrial, arguing that the State had not given proper notice of its intention to introduce “other crimes” evidence of defendant’s physical attack on Mrs. Daigre-pont. The trial judge overruled defense counsel’s objection and denied his motion for mistrial.
 

 Generally, evidence of “other crimes,” or bad acts committed by a criminal defendant, is inadmissible at trial due to the risk of grave prejudice to the defendant. La. C.E. art. 404 B(l);
 
 State v. Prieur,
 
 277 So.2d at 128;
 
 State v. Williams,
 
 01-1007, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1026, 1030. But evidence of “other crimes” may be introduced if it is independently relevant or when it relates to conduct — formerly referred to as res
 
 gestae
 
 — that “constitutes an integral part of the act or transaction that is the subject of the present proceeding.” La. C.E. art. 404 B(l).
 
 Res gestae
 
 events constituting “other crimes” are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its ease without reference to them.
 
 State v. Taylor,
 
 01-1638, p. 10 (La.1/14/03), 838 So.2d 729, 741,
 
 cert. denied,
 
 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004).
 

 The
 
 res gestae
 
 doctrine is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime, if a continuous chain of events is evident under the circumstances.
 
 State v. Taylor,
 
 01-1638 at 10-11, 838 So.2d at 741. The
 
 res gestae
 
 doctrine is designed to allow the story of the crime to be told in its entirety, by proving its immediate context of happenings in time and 113place.
 
 Taylor,
 
 01-1638 at 11, 838 So.2d at 742. Furthermore, the State is not required to provide the defendant with notice before introducing
 
 res gestae
 
 evidence. See La. C.Cr.P. art. 720;
 
 State v. Ridgley,
 
 08-675, p. 13 (La.App. 5 Cir. 1/13/09), 7 So.3d 689, 697.
 

 Here, Mrs. Daigrepont’s testimony that defendant physically attacked her at his apartment was integral to the chain of events that led to Dirk Guidry’s death. Mrs. Daigrepont stole cocaine and money from defendant, which triggered his physical attack on her. Mrs. Daigrepont’s description of defendant’s attack caused her husband and brother to pursue defendant, which led to defendant’s fatal shooting of her brother, Dirk Guidry. The testimony at issue completed the story of the crime. This testimony was
 
 res gestae,
 
 defendant was not entitled to prior notice, and the trial court did not err in denying his mistrial motion. Accordingly, we find that this assignment of error without merit.
 

 In his final assignments of error, defendant argues that his sentence in this matter is excessive and the district court erred in denying his motion to reconsider sentence. Specifically, defendant argues that the trial court abused its discretion in
 
 *284
 
 sentencing him to 40 years at hard labor, the maximum term under the manslaughter statute, La. R.S. 14:31.
 
 [5]
 
 Defendant points out that his criminal history was minimal, whereas the victim had numerous criminal convictions. The State responds that the sentence does not constitute an abuse of discretion.
 

 The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness.
 
 State v. Smith,
 
 01-2574, p. 6 (La.1/14/03), 839 So.2d 1, 4, citing
 
 State v. Sepulvado,
 
 367 So.2d 762, 767 (La.1979). A sentence is considered | ^excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.
 
 Id.,
 
 citing
 
 State v. Bonanno,
 
 384 So.2d 355, 357 (La.1980).
 

 A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.
 
 State v. Lobato,
 
 603 So.2d 739, 751 (La.1992);
 
 State v. Lawson,
 
 04-334, p. 6 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622. Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender.
 
 State v. Pearson,
 
 07-332, p. 16 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656.
 

 On appellate review of a sentence, the only relevant question is “ ‘whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.’ ”
 
 State v. Soraparu,
 
 97-1027 (La.10/13/97), 703 So.2d 608, 608 (per curiam) (citations omitted). To be considered excessive, a penalty must be so grossly disproportionate to the severity of the crime that it shocks the sense of justice, or makes no reasonable contribution to acceptable penal goals, and therefore, constitutes nothing more than the needless imposition of pain and suffering.
 
 State v. Guzman,
 
 99-1528, p. 15 (La.5/16/00), 769 So.2d 1158, 1167 (citation omitted).
 

 Here, the trial court judge gave extensive reasons for imposing the maximum sentence. First, he noted that the victim did not have a gun at the time of the shooting. Second, he felt that, when defendant’s gun failed to fire the first two times, defendant had an opportunity to withdraw from the conflict, but he consciously chose to fire the third and fatal shot. Third, the shooting was deliberate, and was not self-defense. Fourth, the judge further noted that defendant created a risk to more than one person by firing on the victim. He stated he had 121 considered the sentencing guidelines under La.C.Cr.P. art. 894.1, and felt that “any lesser sentence that I give you would deprecate the seriousness of this offense.”
 

 Defense counsel filed a motion to reconsider sentence, challenging the “excessive and harsh nature of the sentence imposed.” Counsel also made an oral objection to “the imposition of the maximum sentence as being unwarranted.” The judge denied defendant’s motion.
 

 We find no error in the trial court’s broad discretion in imposing this sentence of 40 years. Defendant was initially charged with second degree murder, which carries a mandatory life sentence. La. R.S. 14:30.1. Further, the record reveals sufficient evidence to support a conviction for second degree murder.
 

 
 *285
 
 Further, as the sentencing judge noted, defendant had an opportunity to withdraw from the confrontation when his gun failed to fire, but he did not. More importantly, the evidence reflects that defendant was not acting in self-defense. Additionally, defendant has at least one prior felony conviction. Finally, the victim’s criminal record is irrelevant to the trial court’s determination of sentence. Based. on the foregoing, these two assignments of error lack merit.
 

 Finally, as is our routine practice, the record was reviewed for errors patent, pursuant to La.C.Cr.P. art. 920. Our review reveals no errors patent.
 

 Based on the foregoing, we find no merit in defendant’s assignments of error. Accordingly, we affirm his manslaughter conviction and 40-year sentence.
 

 AFFIRMED.
 

 [1]
 

 . With respect to Mr. Hyman, if habitual offender proceedings have been instituted by the State, those proceedings are not part of this appeal.
 

 [2]
 

 . Ms. Boyer stated that she did not consider that statement to be a threat.
 

 [3]
 

 . The Louisiana Supreme Court has found " ‘[tjhere is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source, because in such cases there is really nothing for the government to disclose.’ ”
 
 State v. Hobley,
 
 99-3343, p. 25, n. 10 (La.12/8/99), 752 So.2d 771, 786,
 
 cert. denied,
 
 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000), quoting
 
 Coe v. Bell,
 
 161 F.3d 320, 344 (6th Cir.1998).
 
 See also, State v. Kenner,
 
 05-1052 (La.12/16/05), 917 So.2d 1081 (per curiam).
 

 [4]
 

 . On March 28, 2008, the State noticed its intent to use "other crimes” evidence. The State listed three instances of “other crimes:” 1) defendant's involvement in the distribution of illegal narcotics with and to Joshua and Leslie Daigrepont; 2) defendant’s acquaintance with Joshua Daigrepont while both men were incarcerated in the Jefferson Parish Correctional Center in March, 2006; and 3) defendant’s assertion, made at his apartment on August 6, 2006, that Leslie Daigrepont had stolen illegal narcotics and money from him. The defense filed an opposition to the State's notice.
 

 On May 16, 2008, the trial court ruled that the State would be allowed to introduce all of the notices "other crimes” evidence. Defendant challenged that ruling in this Court. This Court granted the writ in part, and denied it in part, finding that the trial court erred in granting the State permission to in-
 
 *283
 
 traduce evidence of defendant's use and distribution of illegal narcotics with and to the Daigreponts and evidence of defendant’s acquaintance with Mr. Daigrepont in the Jefferson Parish Correctional Center. The majority further ruled that the trial court properly granted the State’s request to use evidence of defendant’s accusation against Leslie Daigrepont.
 
 State v. Hyman,
 
 08-590 (La.App. 5 Cir. 7/31/08) (unpublished writ).
 

 [5]
 

 . At the time of the commission of the offense, the sentencing range for manslaughter was zero to 40 years at hard labor. La. R.S. 14:31.