JUDE G. GRAVOIS, Judge.
| ^Defendant, Harry Carraby, appeals his conviction and sentence for manslaughter, a violation of LSA-R.S. 14:31. On appeal, he argues that the homicide was justifiable because he acted in self-defense. He also argues that he received an excessive sentence. For the following reasons, we find no merit to defendant’s assignments of error, and thus affirm his conviction and sentence.

*611
PROCEDURAL HISTORY

On February 18, 2009, the St. Charles Parish District Attorney filed a bill of indictment charging defendant, Harry Car-raby, with second degree murder, in violation of LSA-R.S. 14:30.1. On March 4, 2009, defendant pled not guilty at arraignment. On March 16, 17, and 18, 2010, the case was tried before a twelve-person jury, which found defendant guilty of the responsive verdict of manslaughter, in violation of LSA-R.S. 14:31. Following a pre-sentence investigation, defendant was sentenced to twenty years imprisonment at hard labor, with credit for time served. On September 17, 2010, defendant filed a Motion to |sReconsider Sentence, which was denied on September 21, 2010. This timely appeal followed.

FACTS

This appeal concerns an altercation between defendant, Harry Carraby, the victim, Ed Raymond[1] (“Raymond”), and two others, Jy’Vohn Harris (“Harris”) and De-Jae Smith (“Smith”), which took place at Harris’s apartment located at 172 Keller Street in Hahnville, Louisiana, on December 1, 2008.[2] Harris testified that he knew defendant; they had played flag football together. On December 1, 2008, Harris spoke to defendant, who was to sell Harris, Smith, and Raymond some marijuana for approximately $1,500. Defendant drove his white two-door Ford truck to Harris’s apartment. When defendant arrived, Smith and Raymond were in Harris’s room. Harris met defendant outside. They spoke near the back porch.
Harris testified that, after speaking to defendant, he went inside the apartment to discuss the potential purchase with Raymond and Smith. The three men decided that $1,500 was too much money to pay for the marijuana. Harris then went back outside. Defendant placed the bag of marijuana down. Harris then “snatched” the bag of marijuana, ran back inside the apartment, and locked the door. He then proceeded to hide in his bedroom closet. On the way to the closet, Harris handed the bag of marijuana to Smith. While in the closet, Harris heard a window break and also heard defendant and Raymond arguing. According to Harris, defendant stated that he wanted his “stuff’ back, and Raymond replied, “I’m going to get it for you.” After this verbal exchange, Harris heard three or four Lgunshots fired. As he was about to exit the closet, he heard a second set of shots. When he finally exited the closet, he saw Raymond lying on the floor. He then saw Smith enter the apartment, look around, grab his car keys, and leave. When everything in the apartment seemed quiet, Harris called the police and an ambulance.
Harris was charged with armed robbery, simple escape, and attempted possession of marijuana. However, he pled guilty to simple robbery, for which he was on probation at the time of trial.
On cross-examination, Harris admitted that he initially fled from the police because he did not want to go to jail for stealing drugs. He testified that, prior to the shooting, there was never any discussion among himself, Raymond and Smith about robbing defendant of his marijuana. *612 Harris further stated that on the day of the shooting, both Raymond and Smith had guns with them. Smith had a revolver and Raymond had a 9 mm. Harris denied having a gun. Harris further denied tampering with the crime scene, stating that all he did “was move the chair back behind the door.” He testified that when he came out of the closet, the front door was open and the back door was locked. He admitted that he gave several statements to the police, none of which were true. A tape of Harris’s statement to the police was played for the jury.
Smith testified that he knew the victim, Raymond, having grown up with him in the same neighborhood. On December 1, 2008, he and Raymond were at Harris’s house when at some point during their visit, Harris told them that he was going outside to meet with someone. Approximately twenty minutes later, Harris ran back inside the apartment, hid in a closet, and shut the door. Smith and Raymond heard glass breaking and ran toward the noise to see who was coming in. At that time, they met an individual in the hallway. Smith identified the man he |smet in the hallway as defendant. He testified that neither he nor Raymond were armed at that time.
Smith testified that defendant pointed a gun at him and Raymond. Defendant told them that Harris had just stolen his marijuana, and that he wanted his “stuff’ back. Smith told defendant that he would get his marijuana back. He then retrieved the marijuana and “threw it” to defendant. Defendant then shot Raymond, who was unarmed, and ran to his truck. Smith called the police. He then retrieved a gun and went after defendant. Smith shot at defendant’s vehicle. Smith was later arrested and charged with attempted first degree murder and simple robbery. However, he stated that he eventually pled guilty to illegal discharge of a firearm. He contested defense counsel’s claim that he had pled guilty to aggravated assault with a firearm related to the instant case.[3]
Smith admitted that he was not truthful in the first statement that he gave to the police. Specifically, Smith stated that he lied when he told the police that Raymond had a gun and went after defendant. He indicated that he lied because he did not want to go to jail at that time. Smith also lied to the police when he told them that he was not at Harris’s apartment on the day of the murder. A tape of Smith’s interview with the police was played for the jury.
On further cross-examination, Smith contradicted his previous testimony and indicated that he obtained the gun from Raymond when it fell from his pocket as he hit the ground. Smith denied that he was part of a conspiracy to rob defendant of his marijuana and money.
On redirect examination, Smith stated that at no time during the incident did Raymond have a gun in his hand. After defendant shot Raymond, Smith picked up | ^Raymond’s gun, which had fallen out of Raymond’s pocket, and followed defendant while firing shots.
The State called Detective Jeremy Pitchford of the St. Charles Parish Sheriffs Office. Detective Pitchford was the first detective to arrive on the murder scene at 172 Keller Street after the call came out from dispatch. When he first arrived, Pitchford observed several casings in the parking lot outside, as well as part of a license plate frame. Upon entering the apartment, he saw that a window in the living room had been broken. In the *613 hallway, he saw the lower half of Raymond, who was lying there deceased. In observing Raymond and the immediate surroundings, Detective Pitchford could see fired shell casings in the hallway and in the bathroom down the hall. There was a bullet hole in the wall just above Raymond’s head. There were no weapons or casings or other items from a weapon found in the vicinity of Raymond.
At some point during the investigation, Detective Pitchford received a call about a vehicle having been stopped that fit the description given by dispatch. The suspect in the vehicle, identified as defendant, was subsequently transported to the detective’s office. Detective Pitchford interviewed defendant in his office. The interview was both videotaped and audio-taped.[4] Defendant’s videotaped statement was played for the jury.
Detective Pitchford testified that parts of defendant’s statements were consistent with the physical evidence at the scene. For instance, the back window of the house was broken, which defendant admitted breaking in his statement. However, there were also discrepancies between defendant’s statement and the physical evidence regarding the location from where the shots were fired. Detective Pitchford further stated that all of the casings and rounds that were 17recovered in the apartment were .40 caliber. No 9 mm casings were found inside the apartment. However, six 9 mm casings were found outside the apartment.
On cross-examination, Detective Pitch-ford further discussed what he felt were inconsistencies between the physical evidence and defendant’s statement. Specifically, he opined, based upon the positions of the casings and bullet holes in the apartment, it appeared that defendant was firing from different directions. Detective Pitchford acknowledged, however, that witnesses to the murder had admitted tampering with the crime scene. He also acknowledged that it was possible that someone could have kicked the casings in various directions while pursuing defendant.
On redirect examination, Detective Pitchford was again asked about the inconsistencies in defendant’s recorded statements. In defendant’s statement, he first said that Harris brought him inside the apartment. However, later in his statement, defendant said that Harris grabbed the marijuana off the porch, and then defendant broke the window to enter the apartment. Additionally, in his statement, defendant first said that he never saw Smith. However, he later indicated that he was surrounded by all three men. In summary, Detective Pitchford concluded that defendant lied multiple times in his statement.
The State also called Captain Craig Pet-it of the St. Charles Parish Sheriffs Office, who participated in this investigation. Captain Petit stopped defendant in his vehicle on Interstate 310 northbound. According to Captain Petit, defendant “threw his hands up in the air and said I know why you’re stopping me.” He further made a statement about weapons being in the vehicle. At that point, the vehicle was secured until detectives and crime scene technicians arrived on the scene.
|8The State also called Deputy Othello Carter, a crime scene technician with the St. Charles Parish Sheriffs Office. On December 1, 2008, Deputy Othello processed defendant’s pickup truck. The *614 State presented various exhibits which Deputy Carter identified. Of particular significance were State’s Exhibit 41A-N, a series of photographs which depicted possible impact indentation on the vehicle and a “blood-like substance” that had been smeared. Deputy Carter stated that the dents appeared to have been made from a fired projectile, and that the “blood-like substance” was found inside and outside of the vehicle. State’s Exhibit 45A-K were photographs which showed two weapons that Deputy Carter found inside the vehicle — one a revolver with the hammer cocked back, and the other a semi-automatic pistol. State’s Exhibit 7 was a Beretta .40 caliber semi-automatic pistol and two magazines, which were recovered from the center console in the front seat of defendant’s truck. One magazine was inside the weapon and another magazine was found inside a holster. State’s Exhibit 9 was a Smith and Wesson revolver located on the passenger side floorboard of defendant’s truck. That gun was cocked and it contained “four rounds and two empty cylinders, two empty casings.” Carter also testified that he secured five unfired Winchester bullets in the magazine that was inside the .40 caliber gun. He further recovered unfired bullets in other magazines as well, identified in State’s Exhibit 62.
Deputy Carter identified State’s Exhibit 46A-J as green vegetable matter that was found in the back seat of the vehicle. State’s Exhibit 47A-H were photographs that Deputy Carter took of defendant to depict injuries on his limbs.
On cross-examination, Deputy Carter stated that in searching defendant’s vehicle, he did not find documentation of the ownership of the .40 caliber weapon. The Beretta .40 caliber handgun had five rounds taken from the magazine, and there was a live round in the chamber as well. For the .38 caliber weapon, the | ahammer was cocked on a live round in the chamber. In total, there were four live rounds in the chamber and two empty casings.
Joel O’Lear testified in his capacity as a firearms and tool mark examiner for the Jefferson Parish Sheriffs Office crime laboratory, and was admitted as an expert in this field without objection. O’Lear was questioned about State’s Exhibit 52, which was a scientific analysis report for weapons recovered in the case. With respect to the Beretta .40 caliber pistol, O’Lear matched six fired cartridge cases to this particular weapon that had been recovered. The second weapon examined was the Smith and Wesson revolver. O’Lear did not find any projectiles or casings that matched that particular weapon. He also received several 9 mm caliber fired cartridge casings, which he determined were fired from the same weapon. However, that weapon was not recovered. O’Lear stated that he also examined several projectiles, copper-jacketed projectiles, a copper jacket, and a “lead like core” — a piece of the projectile. He determined that all of these specimens had been fired from the Beretta pistol.
Dr. Samantha Huber, a forensic pathologist employed in Orleans Parish, was accepted without objection as an expert in the field of forensic pathology. She testified that she conducted a forensic autopsy of Raymond. In this case, Raymond sustained five gunshot wounds to his body. Dr. Huber explained that two of the shots caused substantial internal damage, while three of the shots only hit soft tissue and would not be considered life threatening. Of the three soft tissue wounds, one was in Raymond’s left buttocks, and the path of the bullet came from below and ultimately exited the hip. A second non-lethal shot entered the bottom of the heel and exited *615 the back of the heel. Dr. Huber opined that in order for a shot to be made to the heel, it would have to be off of the ground. The cause of death in this case was determined to be gunshot wounds to the chest and abdomen. |10On cross-examination, Dr. Huber answered that it was possible that the wound made to the heel was a ricochet. A toxicology analysis of Raymond’s blood was positive for THC, commonly called marijuana.
Defendant testified in his own defense. He testified that he knew Jy’Vohn Harris through playing football with him in Algiers. He stated that on December 1, 2008, Harris called him several times about purchasing marijuana. They were first supposed to meet in Avondale, but Harris did not show up. Finally, defendant went to Harris’s apartment in Hahnville. When defendant arrived, Harris took him to the back door of the apartment and they went inside. At that time, defendant took out the bag of marijuana and set it on the floor. As they were attempting to weigh the marijuana, Harris picked up the marijuana, pulled out his gun, and pushed defendant into the glass near the back door. Harris then ran from the room, dropping his gun. Defendant went into the hallway and picked up the gun that Harris had dropped, which was either a .38 or a .357 caliber.
At that time, a door opened, and defendant could see Raymond and Smith. Smith was ducked behind the TV pointing a gun at him, and Raymond was standing in front of defendant. Defendant also saw Harris peeking out of a closet. Smith asked defendant for his money. Defendant threw Smith approximately $1,400, which landed on the floor, and Smith picked up the money. As defendant was about to leave, he saw the barrel from Raymond’s gun. At that point, defendant moved out of the way and began firing.
Defendant testified that prior to the shooting, his own gun was tucked in his pants, under his shirt. He also had the second gun that he had picked up in the hallway, which he was holding by the barrel in his left hand. Defendant stated that he fired his gun four or five times within seconds. After the shooting, Smith threw the marijuana toward defendant, who picked it up at his feet. Defendant then |n headed to his truck. He sensed that Smith was coming after him. While in his truck, shots were fired at him. Defendant denied standing over Raymond and shooting him. He further testified that he had no intent to kill anyone when he went to Harris’s house. He only intended to sell the marijuana.
Later, when defendant saw a marked police unit following him on Interstate 310, he pulled over. He said that he cooperated with the detectives and gave a statement. Defendant acknowledged that he did not mention anything about marijuana in his initial statement. Defendant further admitted that he told the police that he broke the window in order to enter the apartment. However, he testified that he did not break into the apartment, and that he was confused at the time he made that statement.
On cross-examination, defendant reiterated that he had been invited inside the apartment. He testified that when he approached the apartment, he had a gun in his hand and then holstered it as he entered the apartment. He stated that when he saw Smith behind the television set, he still had his weapon holstered under his shirt. As the situation escalated, defendant wanted to leave, but then Raymond pulled a gun on him. After the shooting occurred, defendant threw the gun that had killed Raymond onto the seat of his truck, and he placed the holster in the door. Defendant admitted that at the time *616 he saw Smith with a gun, he could have turned and exited the apartment. Defendant did not leave, however, because he wanted his marijuana back. He stated the value of the marijuana was about $700.
Defendant testified that he was confused when he told detectives that Harris had been the one to pull a gun on him and demand his money, instead of Smith as indicated in his trial testimony. Defendant admitted that he lied when he told detectives that he pulled out his gun on Harris after Harris demanded his money. Defendant also admitted lying when he said that he took the .38 revolver from 112Harris. Although defendant at first denied it, he admitted that someone told him not to shoot. Defendant told detectives that the man with the dreads (Smith) was trying to help get his money back. However, at trial, defendant testified that Smith was trying to rob him. Defendant also admitted that he lied to the detectives when he told them that he left the marijuana in the truck when he first arrived at Harris’s apartment.
ASSIGNMENT OF ERROR NUMBER ONE — Self-defense
Defendant argues that the homicide was justifiable because he acted in self-defense. Defendant asserts that two guns were pointed at him; therefore, a high probability existed that he would have been shot in the back had he attempted to leave the apartment.
The State contends that the evidence proves that defendant was the aggressor and the only person to use deadly force during the incident. The State further argues that defendant’s testimony that he acted in self-defense was completely contradicted by the testimony of DeJae Smith. Therefore, “the jury obviously made a credibility determination and decided not to accept the defendant’s version of the facts.”
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Bailey, 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005) (quotation omitted). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
In this case, defendant was charged with second degree murder, but was convicted of the responsive verdict of manslaughter. On appeal, defendant does not dispute that the State proved the elements of the offense. Rather, he claims that the killing was justified because he acted in self-defense.
When a defendant in a homicide prosecution claims self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Brown, 414 So.2d 726, 728 (La.1982); State v. Theriot, 07-71, pp. 12-13 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020, writ denied, 07-1598 (La.2/1/08), 976 So.2d 715. The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. LSA-R.S. 14:18. According to LSA-R.S. 14:20, a homicide is *617 justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.”
A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. State v. Mills, 04-489, p. 7 (La.App. 5 Cir. 3/29/05), 900 So.2d 953, 959, writ denied, 05-1470 (La.1/13/06), 920 So.2d 235 (citing LSA-R.S. 14:21). In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger. Theriot, 07-71 at 13, 963 So.2d at 1020. The determination of a defendant’s culpability rests on a two-fold test: 1) 114whether, given the facts presented, the defendant could reasonably have believed his life to be in imminent danger; and 2) whether deadly force was necessary to prevent the danger. Theriot, 07-71 at 12, 963 So.2d at 1020. The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. Theriot, 07-71 at 13, 963 So.2d at 1020.
In this case, the jury was presented with several different versions of the events that occurred on the day of the shooting. The witnesses’ testimony differed, as did their testimonies from their recorded statements. At trial, defendant claimed that he killed the victim in self-defense. He testified that he was in Harris’s living room, trying to weigh the marijuana, when Harris picked up the marijuana, pulled out his gun, and pushed defendant into the glass near the back door. He stated that Harris then ran from the room, dropping his gun. Defendant picked up Harris’s gun, and began looking for him in the hallway. He then saw Smith ducked behind a television, pointing a gun at him. He stated that Smith demanded his money, and defendant threw it to him. Defendant further stated that he and Smith argued over the marijuana. As defendant prepared to leave, he saw that Raymond had a gun. He stated, “I just looked down the barrel and I just moved out the way and went to shooting.” Smith then threw the marijuana to defendant, and defendant ran outside to his vehicle. He admitted to shooting four or five times. He stated that he felt his life was in danger.
It appears that the jury found the State’s version of events as presented by its witnesses more credible. Smith testified that he and Raymond (the victim) were at Harris’s apartment on the day of the murder. Harris went outside to meet with someone. About twenty minutes later, Harris ran inside the apartment and into a closet. Smith stated that he and Raymond heard glass breaking and they ran to the | lshallway where they were confronted by defendant. Defendant pointed his gun at them and demanded the return of his marijuana. Smith retrieved the marijuana and “threw it” to defendant, at which time defendant shot Raymond. Smith testified that neither he nor Raymond were armed with a weapon.[5]
Harris testified that, on the day of the murder, he went outside to talk with defendant. He then grabbed defendant’s marijuana and ran inside the apartment and hid in the closet. While in the closet, he heard a window break and heard defen *618 dant and Raymond arguing about the marijuana. Harris then heard approximately three or four gunshots fired.
Additionally, the State played defendant’s statement to the police for the jury. Although defendant initially stated that he was invited into the apartment, he subsequently indicated that he broke the window glass, reached in and opened the door. Defendant’s second version of events is consistent with Smith and Harris’s account of how defendant entered the apartment. If the jury found that defendant broke into the apartment, he would be the aggressor. Courts have found that a person who is the aggressor cannot claim self-defense, unless he withdraws from the conflict in good faith. See State v. Carrier, 95-1003, p. 7 (La.App. 3 Cir. 3/6/96), 670 So.2d 794, 799, writ denied, 1996-0881 (La.9/20/96), 679 So.2d 431 (finding defendant’s self-defense argument to be without merit, as he was the aggressor “who brought about the difficulty by forcibly entering” the apartment); see also Mills, supra.
The jurors clearly found the testimony offered by the State’s witnesses to be more credible than defendant’s testimony. The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact, and when faced with a conflict in testimony, the trier of fact is free to | lfiaccept or reject, in whole or in part, the testimony of any witness. State v. Singleton, 05-622, p. 7 (La.App. 5 Cir. 1/31/06), 922 So.2d 647, 651. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence absent impingement on the fundamental due process of law. Id. The jury was presented with all of the evidence, and it appears the jury rejected defendant’s claim of self-defense.
Further, the number of gunshot wounds to decedent’s body, in addition to the location of the wounds, refutes defendant’s claim of self-defense. Dr. Samantha Huber, who performed the forensic autopsy on decedent, testified that the victim sustained five gunshot wounds to his body. Decedent sustained wounds to his chest and lower abdomen, and he had soft tissue injuries to his arm, buttocks and heel. Dr. Huber testified that for decedent to have sustained the wound to his heel, his heel would have to have been off the ground. One possible scenario would be if decedent was bending at the knee, which would mean that decedent’s back was to the gun. She also testified that the injury could have been sustained if decedent was falling forward, running away, or if decedent was already down. Additionally, the wound to decedent’s buttocks entered the left buttocks and exited the side of the hip. This suggested that decedent’s back was to the gun when he sustained this wound.
In State v. Thomas, 44,113 (La.App. 2 Cir. 4/8/09), 7 So.3d 838, 843, writ denied, 09-1041 (La.2/5/10), 27 So.3d 296, the Second Circuit stated that even if the victim had pulled a gun on the defendant, “the fact that [the defendant] shot him six times before [the victim] got off a single round seems to refute the theory of reasonable necessity.” Similarly, in this case, even if the victim had pulled a gun on defendant, the fact that defendant shot him five times, two times which 117appear to have occurred when the victim’s back was to defendant or when the victim was on the ground, seems to refute the theory of reasonable necessity-
Additionally, on cross-examination, defendant admitted that he could have left the apartment when he saw Smith had a gun. This Court has held that the possibility of escape from an altercation is a recognized factor in determining whether *619 defendant had a reasonable belief that deadly force was necessary to avoid the danger. See Theriot, supra.
Based on the foregoing, we find that the State met its burden of proving defendant did not act in self-defense. This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER TWO — Excessive sentence
In his second assignment of error, defendant contends that the trial court erred in imposing an excessive sentence, considering that he was a first-time offender. Defendant also asserts that the court failed to consider mitigating factors such as his age, educational background, family dynamics, and factual circumstances surrounding his arrest. Conversely, the State argues that the sentence imposed was within the statutory limits and the trial court’s wide discretion.
In this case, defendant was convicted of manslaughter, a violation of LSA-R.S. 14:31. With respect to sentencing, the statute, in subsection B, provides in relevant part: “Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years.” Therefore, defendant’s sentence of twenty years is a mid-range sentence.
On the date of sentencing, the record reflects that the trial court took several factors into consideration. The court indicated that it had reviewed a pre-sentence report completed by the Department of Public Safety and Corrections. The court |lsaIso noted that defendant armed himself while going to sell drugs, knowing that there was a possibility that “things could go wrong.” The court considered that defendant had no prior convictions, defendant’s age, and the possibility of rehabilitation. The court also took into account the fact that defendant had a young child.
The record reflects that, at the time of sentencing, defendant did not move to reconsider his sentence pursuant to LSA-C.Cr.P. art. 881.1, nor did he object to his sentence at the time his sentence was imposed. While defendant did ultimately file a written motion to reconsider sentence, the failure to state specific grounds upon which the motion was based limits a defendant to a review of his sentence for constitutional excessiveness only.[6] State v. Warmack, 07-311, p. 7 (La.App. 5 Cir. 11/27/07), 973 So.2d 104, 108; see also LSA-C.Cr.P. art. 881.1.
In his brief, defendant refers to LSA-C.Cr.P. art. 894.1 and argues that the trial judge failed to consider mitigating factors in his case. As noted above, defendant did not specify the grounds upon which the motion to reconsider his sentence was based. As such, to the extent that defendant argues that the judge failed to articulate his reasons for sentencing pursuant to LSA-C.Cr.P. art. 894.1, defendant is precluded from raising such an issue on appeal. See State v. Declouet, 09-1046, p. 13 (La.App. 5 Cir. 10/12/10), 52 So.3d 89, writ denied, 10-2556 (La.4/8/11), 61 So.3d 681; State v. Ridgley, 08-675, p. 20 (La.App. 5 Cir. 1/13/09), 7 So.3d 689, writ denied, 09-0374 (La.11/6/09), 21 So.3d 301. In any event, this Court has held that where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1. Declouet, 09-1046 at 14, 52 So.3d at 89.
*620 | igThe Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. State v. Pearson, 07-332, p. 15 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 655. A sentence is considered excessive, even when it is within the applicable statutory range, if it imposes needless and purposeless pain and suffering or is grossly disproportionate to the offense. Warmack, 07-311 at 7, 973 So.2d at 109. In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the sense of justice. Pearson, 07-332 at 15, 975 So.2d at 655-56. The trial judge is afforded wide discretion in determining a sentence. Id., 07-332 at 15, 975 So.2d at 656.
In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. The relevant issue on appeal is whether the trial court abused its sentencing discretion, and not whether another sentence might have been more appropriate. Pearson, 07-332 at 15-16, 975 So.2d at 656.
Defendant’s sentence is commensurate with similarly situated defendants who have been convicted of manslaughter. In State v. Lathan, 41,855 (La.App. 2 Cir. 2/28/07), 953 So.2d 890, writ denied, 07-805 (La.3/28/08), 978 So.2d 297, the defendant received a 27-year sentence for his manslaughter conviction, which was the defendant’s first felony conviction. It was noted he only had misdemeanor convictions that occurred during the breakup of his marriage 20 years earlier. It was also noted the defendant had a work history. The court stated that there was no requirement that any specific matter be given any particular weight inJjjdetermining a defendant’s sentence and concluded the defendant’s sentence was not excessive. Id., 41,855 at 13, 16, 953 So.2d at 899-900.
Also, in State v. Hodge, 41,097 (La.App. 2 Cir. 8/23/06), 938 So.2d 1066, the Second Circuit found the defendant’s 22-year sentence for manslaughter was not constitutionally excessive. The trial court noted that the defendant lacked any significant criminal history, had a good employment history and community involvement, and showed remorse for the crimes. But, the trial court also noted that the defendant shot two people “ ‘after an evening of argument and flared tempers.’ ” Id., 41-097 at 9, 938 So.2d at 1072. The trial court concluded “the level of provocation could not alleviate the sentence to any great extent.” Id.
Defendant in this case had no prior convictions and appeared to show remorse for his actions. Nonetheless, as noted by the trial court, defendant engaged in the sale of drugs while armed with a dangerous weapon and with the knowledge that there was a possibility he would have to use the gun. Defendant’s actions resulted in the death of another person. Considering the jurisprudence and the circumstances of this case, we find that the trial court did not abuse its discretion when sentencing defendant. Defendant’s mid-range sentence is not grossly disproportionate to the severity of the offense and does not shock the sense of justice. This assignment of error is without merit.

ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Wetland, 556 So.2d 175 (La.App. 5 Cir.1990). No matters were found that require corrective action.

*621
¡^CONCLUSION

For the above reasons, defendant’s conviction and sentence are affirmed.

AFFIRMED

. Although the transcript refers to the victim as "Ed Raymond,” he is referred to as "Edd Raymond” in most of the law enforcement documents found in the record.

. The State’s first two witnesses to testify. Sergeant Bill Slayton, evidence custodian for the St. Charles Sheriff’s Office, and Deputy Joseph Marrocolli, crime scene technician with the St. Charles Parish Sheriff's Office, both accounted for the chain of custody for numerous State exhibits introduced at trial.

. Smith had previously been arrested for carrying an illegal weapon on school grounds and pled guilty to illegal carrying of a weapon.

. The State introduced a Miranda rights form that Detective Pitchford filled out when he advised defendant of his rights. Defendant initialed the form after the Miranda rights were read to him.

. On cross-examination, Smith testified that “When [Raymond] hit the ground, [the gun] fell out.” On re-direct, Smith stated that he knew Raymond had a gun, but it was not in his hand when the incident occurred.

. In defendant’s motion to reconsider, he merely argued that the basis of his motion was that “the sentence imposed upon him is excessive and that there were other sentences that could be imposed upon the defendant that would be more reasonable under the circumstances of this case.”