STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**24-80**

**STATE OF LOUISIANA**

**VERSUS**

**KERRI SEENEY MONIC**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 7131-21
HONORABLE KENDRICK J. GUIDRY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Van H. Kyzar, Sharon Darville Wilson, and Gary J. Ortego, Judges.

**AFFIRMED.**

Peggy J. Sullivan
Louisiana Appellate Project
P.O. Box 1481
Monroe, LA 71201
(318) 855-6038
COUNSEL FOR DEFENDANT/APPELLANT:
    Kerri Seeney Monic

Stephen C. Dwight
District Attorney
John Eric Turner
Assistant District Attorney
Fourteenth Judicial District
901 Lakeshore Drive, Suite 800
Lake Charles, LA 70601
(337) 437-3400
COUNSEL FOR APPELLEE:
    State of Louisiana

**KYZAR, Judge.**

Defendant, Kerri Seeney Monic, appeals her conviction and sentence for second degree murder. For the reasons herein, we affirm her conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

On April 29, 2021, Defendant was charged in the Fourteenth Judicial District, Calcasieu Parish, with having committed the second degree murder of William Saul Clark, on or about January 21, 2021, in violation of La.R.S. 14:30.1. On July 12, 2021, Defendant entered a plea of not guilty. The trial began with jury selection on September 6, 2022, and the first witness was called the next day.

Evidence presented at trial established, without contradiction, that the victim died after Defendant shot him in the head with a handgun.[1] Although Defendant initially denied any knowledge of the circumstances surrounding the victim's death, she ultimately admitted that she killed the victim in self-defense.

The jury heard testimony from Thelma Andrepont, the victim's aunt, that the victim and Defendant, who were in a relationship, lived with her at her home in Sulphur, Louisiana. On the day of the murder, Defendant, driving Ms. Andrepont's vehicle, took Ms. Andrepont to a medical appointment, arriving at the West Calcasieu-Cameron Hospital at 1:15 p.m. The appointment lasted about forty-five minutes, after which Defendant met Ms. Andrepont at the hospital's front entrance to take her back home. On their return, they found the garage door open. Ms. Andrepont was unable to enter the house through a door inside the garage, which was blocked from the inside by the victim's body. She testified that she could see

---

[1] Defendant conceded in the opening statement that she shot and killed the victim.

the victim's feet through the partially opened door and that Defendant drew her attention to a bullet hole in the door's window, right above where Ms. Andrepont was standing. Ms. Andrepont told Defendant to call 911. She stated that Defendant acted hysterically when the victim's body was discovered and never mentioned that she knew anything about the victim being shot.

On cross examination, Ms. Andrepont was asked whether there was a history of domestic violence between Defendant and the victim:

Q. . . . And did Kerri and Bill sometimes have problems with each other?

A. Yes.

Q. Okay. Did police get called about that stuff sometimes?

A. I think a couple of times.

Q. Okay. And one of the other of them might get picked up for domestic violence occasionally?

A. I don't remember.

. . . .

Q. Okay. But amid all this yelling and arguing, did you see either one of them hit the other one?

A. No. I never did see either one of them hit the other one.

Q. Did you ever hear anybody slap?

A. No.

Q. Did you ever hear anybody get pushed up against the wall?

A. No.

Q. Did you ever see any marks on Ms. Kerri's face that were from Bill?

A. No.

Q. Did you ever see any marks on Bill?

A.    No.

Q.    Was it always just yelling and arguing?

A.    Right.

Ms. Andrepont further stated that while the two argued and would sometimes get in each other's faces, she never observed either of them strike the other. She said that typically, the victim would withdraw from the argument and go smoke a cigarette in the garage to calm down. Sometimes, Defendant would follow him in an attempt to continue the argument.

The State's next witness was Christalle Fontenot, a 911 dispatcher, who received Defendant's call regarding an unresponsive person. Ms. Fontenot identified the 911 call recording, which was played for the jury. In it, Defendant can be heard crying throughout the call while reporting that her "roommate" was in the home.

The State's next witness was Deputy William Vaughan, a dispatcher for the Calcasieu Parish Sheriff's Office (CPSO). Deputy Vaughan introduced a recording of his conversation with Defendant after he was connected to her through 911. In the recording, Defendant can be heard crying throughout the call, making it difficult to understand her; however, she stated that there was a bullet hole in the door and that her boyfriend was blocking the door. She further said that the victim was on the floor unresponsive when they arrived home, and she repeated, "we don't know what happened."

As Deputy Vaughan asked questions about the victim, both Defendant and Ms. Andrepont began answering, with Ms. Andrepont telling him that the victim was diagnosed as both bi-polar and schizophrenic. Defendant told Deputy Vaughan that the victim had not been taking his medication but that he had been taking other drugs; she then began screaming "I don't know" when asked if he took recreational

3

drugs. The remainder of the seven-minute call essentially consists of the sound of Defendant crying.

Senior Corporal Travis Carroll, with the CPSO, testified that he was the first inside the residence as he was small enough to squeeze through the door blocked by the victim's body. The victim had a gunshot wound to the head. While inside, he located a shell casing from a firearm. Corporal Carroll identified a video recording from his body camera during his response to the Andrepont residence, which was published to the jury.[2] In the video, he can be seen pulling the victim away from the door by his feet so that CPSO Officer James Graves could enter the house. Corporal Carroll spent approximately three minutes clearing the house before unlocking and opening the front door of the residence. Corporal Carroll then checked the victim and noted that he was "still warm." He can be heard telling other officers that the victim was propped against the door and the wall when he entered.

The video shows Corporal Carroll, after he exited the house, trying to calm Defendant down and gathering information from her and Ms. Andrepont. At this point, Defendant informed him that the victim owned a .9 mm pistol. However, she noted that she had not seen the gun since she was released from the Concordia Parish Correctional Facility and that the victim had claimed it was stolen.[3] Ms. Andrepont reported that the victim was sometimes suicidal, that he had acted strangely for about a week, and that she had previously stopped him from killing himself with a gun.

---

[2] Corporal Carroll clarified that his body camera footage had Officer Graves's name on it because his camera was malfunctioning, so he had borrowed one from Officer Graves to ensure that he had a functioning camera. He also noted that the time stamp on the video was roughly an hour ahead of what it should have been.

[3] Defendant had admittedly been jailed for a period of time after an altercation with her mother.

She also said that she believed that the victim had not taken his prescribed medications for several years.

While Corporal Carroll was discussing the scene with other officers, one of them noted that Defendant said she owned a .380 caliber gun but that she had not touched it since returning from Concordia Parish. Defendant, who was sitting in Corporal Carroll's vehicle, re-counted that the victim had experienced a terrible day the previous day, which included manic behavior and the repeated telling of incoherent stories. She said that the victim had been involved in an incident approximately two weeks before, when two persons broke into the house and took her purse, and he eventually shot at them in the driveway when they failed to leave. She noted, however, that the victim's story kept changing. Defendant further told Corporal Carroll that she knew the victim used illegal drugs but that Ms. Andrepont would not like to hear it as she treated him like "her son."

In the video, Defendant said that she wished she had stayed with the victim. Corporal Carroll consoled her, telling her nothing she could have done differently would have changed what happened. Corporal Carroll also confirmed, via a phone call, that the victim had called law enforcement about a break-in the week before.

Sargeant Brandon Peresich, of the CPSO Forensics Investigation Unit, testified that a shell casing was found in the laundry area, on top of a cabinet located next to the refrigerator, and he stated that, in his experience, shell casings are typically ejected to the right of the weapon when fired. He also identified photographs of a semi-automatic Smith & Wesson .380 firearm found underneath the driver's seat of Ms. Andrepont's vehicle. Sergeant Peresich testified that the weapon was loaded, as they had to remove a live round from the chamber as well as ejecting the magazine.

5

Cheryl Swearingen, a forensic scientist with the Louisiana State Police Crime Lab, was accepted as an expert witness in Firearms Identification and Toolmark Identification. She testified that in her opinion, the Smith & Wesson .380 caliber gun recovered from the vehicle was the same gun that fired the bullets represented by the shell casing located at the residence near the body of the victim, and one located in the driveway.[4] Like Sergeant Peresich, Ms. Swearingen testified that spent cartridges are typically "ejected out of a firearm up and to the right."

Charles Hunter, Jr., the Calcasieu Parish Coroner's Office Chief Investigator, testified that based on the nature of the gunshot wound to the front of the victim's head, the gun was fired from a distance of about two feet. He testified that if a person were lunging at the shooter when shot, as Defendant later contended, the body would most likely fall face first. In this case, the victim's body was found face up. The victim also tested positive for methamphetamine and amphetamine.

CPSO Detective Travis Mier testified that he interviewed Defendant and identified an audio recording of the interview, which was then published to the jury. In it, Defendant stated that she and Ms. Andrepont left the house at around 1:00 p.m. for Ms. Andrepont's appointment and that the victim had only been awake for about twenty minutes at that time. She stated that before she left, the victim asked her to buy him some cigarettes on the way home. According to Defendant, she sat in the parking lot during Ms. Andrepont's appointment, after which they went to the bank. Defendant stated that while she and Ms. Andrepont were at the hospital, the victim was the only person at the home. After they arrived home, the interior garage door

___

[4] A March 15, 2021 Return of Search Warrant, filed by CPSO Detective Travis Lavergne, indicates that a spent USA 380 AUTO shell casing was recovered from the driveway of Ms. Andrepont's home on January 21, 2021.

would not open, and she attempted to open the back door into the house but the key she had did not work. She then noticed the bullet hole in the interior garage door's window and called 911.

Defendant told Detective Mier that prior to her incarceration, she owned a firearm that was kept in a lockbox in the house, which she believed was a .9 mm Ruger. She noted that she was arrested in November, had been home for less than a week, and had not seen the gun during that time. She told law enforcement that the victim did not have access to Ms. Andrepont's vehicle as Ms. Andrepont would not let him drive it without a license. She then noted that he had driven the car earlier in the week to pick her up from jail. Defendant then redirected questioning and told Detective Mier that the victim had supposedly fired a shot at a women in the driveway to the house, whom he believed had broken into the house and stolen Defendant's purse. She told law enforcement that she did not know the victim to ever be suicidal.

Sergeant Julie Fontenot testified that she works in CPSO's Real Time Crime Center, which aids law enforcement investigations by searching databases. In this case, she searched License Plate Reader databases (LPRs)[5] for the license plate of the vehicle Defendant was driving on January 21, 2021. The LPRs caught the vehicle

---

[5] According to the U.S. Department of Justice, Office of Justice Programs' website, a "[l]icense plate recognition system (LPRs) use[s] optical character recognition (OCR) algorithms to allow computer software to read vehicle license plates[,]" and usually consists of:

1. A camera designed to take images of license plates (numbers and letters)[;]

2. A computer software package that interprets the numbers/letters from the video captured by the LPR camera[; and]

3. A database of previously stored "hot lists" or previously read license plates.

License Plate Recognition (LPR) Systems, https://www.ojp.gov/pdffiles1/nij/nlectc/238827.pdf (last visited September 5, 2024).

7

travelling northbound in the direction of the hospital where Ms. Andrepont had her appointment at two separate times, once at approximately 12:50 p.m., and again after 1:00 p.m. that same afternoon.

Detective Lavergne testified that he examined the evidence gathered by the Real Time Crime Unit for the case. The first LPR hit on the vehicle Defendant was driving that day was going northbound (towards the hospital) at 12:57 p.m. A second LPR hit again showed the car travelling northbound towards the hospital at 1:53 p.m. He stated that this was inconsistent with Defendant's original story that she stayed at the hospital and waited for Ms. Andrepont to complete her appointment:

> So there was an LPR hit on the car about 12:57. Ms. Monic had reported being at the hospital until finding Bill, which would have been around 3:00 -- a little after 3 o'clock. But we had a second LPR hit in that area from the same vehicle, I believe around 1:53.

Detective Lavergne further described reviewing other real time information gathered in the investigation detailing Defendant's movements before and after the murder, including her cell phone location information,:

> That information is uploaded into our ZetX program, and that will automatically map the information provided by the companies. So we uploaded T-Mobile records separate from AT&T, of course. AT&T records indicated that that cell phone had been in the area, as reported, of the residence and then traveled north into Sulphur. So Walker is Carlyss, you know, south Sulphur. So the phone traveled north into Sulphur near the hospital area, and then traveled back south to the residence when she had stated she was actually at the hospital and stayed there for a little while and then traveled back to the hospital before eventually returning back to the residence again. And at that time, stayed there until we removed the phone from the scene.

Detective Lavergne testified that video footage from cameras at the hospital show that rather than staying in the parking lot as Defendant originally told CPSO deputies, she drove out of the parking lot at 1:09 p.m. and then returned to pick up Ms. Andrepont, leaving the hospital with her at 2:15 p.m.

8

Detective Lavergne testified that while searching Ms. Andrepont's vehicle, deputies located a firearm under the driver seat. "It was a .380 caliber, which was matching the caliber of the shell casing located inside the residence near the body as well as the shell casing located in the driveway." He stated that based on the information gathered in the brief time after finding the victim's body, Defendant was placed under arrest. Detective Lavergne testified that at the time of her arrest, Defendant was found to be in possession of methamphetamine and that she had a blister on her lip consistent with what he had seen in previous investigations involving drug users who smoked methamphetamine.

Sergeant Jared Abshire, a member of the CPSO's Digital Forensics Unit, which processes all digital data obtained during investigations, including from cell phones, computers, and vehicles, was accepted as an expert in the field of digital forensics. Sergeant Abshire identified a disc containing cell phone extractions performed on two phones belonging to Defendant. He testified that he found no messages on the phones that indicated someone had been held hostage by the victim as mentioned by Defendant when confronted at the scene. Sergeant Abshire also identified a printout of January 15, 2021 text messages between the victim and a female, which indicate that he was trying to find someone to have sex with prior to Defendant's release from jail. On cross-examination, he noted that the messages also contained evidence that the victim was selling drugs.

The State also called Lieutenant Casey Lafargue, of the CPSO Violent Crimes Unit, who testified that he was the supervisor on scene during the January 21, 2021 investigation. Detective Lafargue stated that he and Captain Beth McGee interviewed Defendant, and he identified the video of that interview, which was played for the jury. In it, Defendant begins by repeating the story she gave while still

9

at the Andrepont residence; that she brought Ms. Andrepont to the hospital, waited in the parking lot, then returned to the home after Ms. Andrepont's appointment to find the door blocked, a bullet hole in the door's window, and no idea of what had happened. Defendant noted that she and the victim had been "boyfriend and girlfriend" for over four years; however, both were legally still married to other people. Defendant claimed that she stayed in the parking lot talking on her phone while Ms. Andrepont was at her appointment.

Defendant stated that the victim seemed "happy-go-lucky" that morning after having a terrible day the prior day. Although she claimed she did not really believe his story about someone breaking into the house, she noted that her debit and food stamp cards were missing, although it did not appear that the food stamp card had been used. Defendant claimed that she found a few more things that were missing but noted that it was only her items that were missing from the house. She noted that the victim had been violent in the past and that on a prior occasion, he had damaged her car to prevent her from leaving the residence. Defendant said that the victim had refused to take any of his medication.

Defendant stated that although the victim was sometimes violent toward others, she never knew him to be suicidal or to say anything about hurting himself. She then related a claim that there were messages on her phone, which the victim used while she was in jail, which indicated that he had kidnapped a woman and held her against her will while threatening her. She claimed that she was not sure if the kidnapping incident described on her phone happened or if the victim was simply hallucinating.

Defendant stated that the victim sold methamphetamines, which he acquired in Starks, Louisiana, although she was not sure if he still obtained drugs from there

10

since her incarceration. She acknowledged that she also took methamphetamine with the victim, but that she had not used drugs since getting out of jail. According to Defendant, the victim would typically keep the methamphetamine in the room he shared with her, stating that she was not sure if there was any there at the time but that she would not be surprised if there was. She also stated that the night before the shooting, the victim left the house in Ms. Andrepont's car and that she believed he went to get methamphetamine.

Defendant stated that on the day of the shooting, she dropped Ms. Andrepont off at her appointment before parking and waiting in the parking lot until the appointment was over. After being told that surveillance video showed her leaving the hospital shortly after dropping Ms. Andrepont off, Defendant then stated that she went to Circle K on Highway 90 for cigarettes and then drove around the block near Circle K before getting a call and returning to the hospital. She claimed that she drove around the hospital area to kill time but did not know where all she drove.

Defendant began screaming and crying hysterically after Lieutenant Lafargue informed her that a license plate reader at the end of her road had picked up the vehicle leaving the house and going to the hospital and then picked it up again when she left the house a second time. While crying Defendant kept repeating, "he couldn't talk to me."

Eventually, Defendant stated that she returned to the house to bring the victim cigarettes and that she entered through the front door of the house, not the door in the garage. She stated that she locked the doorknob on the front door when she left. She claimed that the victim was "down already" when she got home and that the gun was right beside him, indicating that he committed suicide.

When asked why she took the gun and moved it, Defendant alluded to not wanting to tell Ms. Andrepont that the victim had killed himself before beginning, repeatedly, to state that she "didn't kill the man." Defendant then restarted her story, saying she went into the house through the garage door to bring the victim the cigarettes he had requested and that he was upstairs on the bed. According to Defendant, she asked him about the text messages she had found on her phone from him seeking a sexual relationship with another female while she was in jail, and she claimed that he told her it did not happen and that she was wrong. After saying that he lunged at her upstairs, Defendant claimed she went downstairs to leave. Defendant then said that the victim walked out the garage door in front of her, turned around, and came back in, refusing to let her leave. She stated that she pulled her gun out of a blue cabinet by the door and claimed that the victim lunged at her throat. Defendant claimed that the victim made a comment about it being the last day she would be seen alive.

According to Defendant, "the gun went off," and she just ran. She stated that she did not see where she shot the victim, and she then went out through the front door taking the gun with her, locking the door handle as she went. Defendant stated that the gun was still under the seat of the car and that she went back to the hospital to wait for Ms. Andrepont. According to Defendant, the victim "put his hands on her" two days before the shooting, while angry that she had gone to see her daughter. Defendant stated that the gun she used was the victim's handgun that he kept by the garage door, in the pull-out drawer of the blue cabinet. Although she did not know what type of gun it was, she identified it as a small, black gun with a clip.

Defendant continued trying to explain how the situation had played out, claiming that the victim came back inside from the garage, shut the door on the way

12

back in, and lunged at her when he saw her reach into the blue cabinet. According to Defendant, she grabbed the gun when the victim walked into the garage, before he re-entered the house and lunged at her. She stated that she had never used that gun before but noted that it was being kept in the same place she had previously kept her Ruger, which had been confiscated following a drug arrest. Stating that they were within an arm's reach of each other, Defendant claimed that the victim reached past the gun, reaching for her neck and when she shot him, he dropped "right then." She said that she did not call 911 at the time because she did not know what to do after killing a man.

Defendant acknowledged that she did not think law enforcement would believe that the victim committed suicide after she took the gun but claimed she was not thinking at the time. She claimed she did not go to the house specifically to confront the victim about the text messages and that she thought grabbing the gun would stop the victim from hitting her, but "all [she] did was kill him." Defendant said that she did not believe the victim was going anywhere when he went outside, claiming he was threatening to call the police and have her arrested, despite him not having a phone. She stated that his behavior "was just being in [her] fucking face arguing and fighting."

Defendant stated that she mentioned the issue of the text messages about the kidnapping because law enforcement had asked her about his mental state, and she knew he had a history of harming people. According to Defendant, the victim had not actually hit her that day "the way he usually does" but she was done with him hitting her. She again claimed that she read the text messages on her phone, about him seeking a sex partner, for the first time that morning, before she dropped Ms.

13

Andrepont off, went to the Marshland Tobacco to get cigarettes, and then went home to confront him.

Defendant stated that she knew law enforcement would figure out what had happened, but she did not know what to tell Ms. Andrepont, and she was freaking out and did not even think of trying to get rid of the gun. Defendant said she just did not know how to tell law enforcement that she had shot the victim. When asked if she had anything illegal on her, Defendant acknowledged that she had a "rock of dope" in her underwear, which she confirmed was methamphetamine. Defendant claimed that the victim had given her the drugs before she left for the hospital with Ms. Andrepont. She told law enforcement that the rest of the victim's drugs were in their room.

The interview ends with Defendant being informed that she would be charged with possession of methamphetamine as well as second degree murder. Defendant stated that the spent casing in the driveway must have been from when the victim shot at the two persons he believed were breaking into the house a few days before, stating that he only fired once. The video ended with Defendant being handcuffed and removed from the interrogation room.

After the State rested its case in chief, Defendant called two witnesses in support of her self-defense claim. The first was Misty LeBrun, who testified that she lived in the neighborhood and saw lots of traffic coming from and going to the house where Defendant and the victim lived. She stated that the victim burned things in the yard at night and that she saw the two of them arguing and yelling at times. She stated that the victim threw things at Defendant. She testified that the victim and Defendant were fighting the night before the murder and that she told this to CPSO Detective Michael Miller when he interviewed her on January 21, 2021.

14

Robert Clark testified on behalf of the defense and stated that he knew both the victim and Defendant in the time leading up to the murder. He testified that the victim was verbally abusive towards Defendant at times, and although he had seen the victim grab Defendant by her arm and pull her on one occasion, he did not contact the police. He admitted that he never saw the victim physically strike Defendant, but if he had, he would have intervened. He admitted to smoking methamphetamine and stated that Defendant did so too, along with others.

On September 10, 2022, the jury returned a verdict of guilty to the charge of second degree murder. Following the conviction, Defendant filed a Motion for New Trial on September 23, 2022, which was denied without hearing. On November 4, 2022, Defendant was sentenced to life in prison, at hard labor, without the benefits of probation, parole, or suspension of sentence. A Motion to Reconsider Sentence was filed November 15, 2022, and was denied without hearing. This appeal followed, wherein Defendant sets forth the following assignments of error:

I.    The evidence adduced at trial was insufficient to prove beyond a reasonable doubt that Kerry Monic was guilty of second degree murder, in that:

    a.    Kerry Monic was acting in self-defense when William Clark was shot.

    b.    Even had Kerry Monic not been acting in self-defense, the evidence would at most support a conviction of manslaughter, not second degree murder.

II.   A request to provide a jury instruction relative to the right of Kerry Monic to stand her ground and protect herself was denied. This denial constituted error and deprived Ms. Monic of her right to a fair trial.

III.  Kerry Monic was entitled to have the trial court rule on the unconstitutional excessiveness of a life sentence for this offense. The trial court made no effort to set forth any basis for the

sentence of life imprisonment without benefit of parole, probation, or suspension of sentence.

## DISCUSSION

### *Insufficiency of Evidence and Denial of Jury Charge*

We first consider Defendant's claim that the evidence was insufficient to support the verdict. In doing so, we also consider Defendant's assertion that it was error for the trial court to refuse her requested jury charge pertaining to her right to stand her ground as it relates directly to the nature and extent of the evidence surrounding the murder charge and her self-defense claim.[6]

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As it pertains to this case, La.R.S. 14:30.1(A)(1) defines the crime of second degree murder as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" Specific "intent is that state of mind

---

[6] "When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence." *State v. Theriot*, 07-71, p. 10 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1018, *writ denied*, 07-1598 (La. 2/1/08), 976 So.2d 715

16

which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent "may be formed in an instant[]" and "may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Brown*, 16-998, p. 46 (La. 1/28/22), 347 So.3d 745, 787, *cert. denied*, __ U.S. __, 143 S.Ct. 886 (2023). Specific intent to kill may also be inferred from the act of pointing a gun at the victim and firing it. *State v. Reed*, 14-1980 (La. 9/7/16), 200 So.3d 291, 309, *cert. denied*, 580 U.S. 1166, 137 S.Ct. 787 (2017).

This case also involves a claim of self-defense by Defendant. A homicide is justifiable when it is "committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(A)(1). When the accused raises the defense of justification, the State must prove beyond a reasonable doubt that the crime was not committed in self-defense. *State v. Matthews*, 464 So.2d 298 (La.1985). "[T]he relevant inquiry on appeal . . . is whether a rational factfinder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense" *State v. Garcia*, 483 So.2d 953, 956 (La.1986). "When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt." *State v. Dunn*, 21-630, p. 13 (La.App. 1 Cir. 12/22/21), 340 So.3d 77, 86, *writ denied*, 22-95 (La. 4/5/22), 335 So.3d 834.

Defendant claims that the State failed to prove beyond a reasonable doubt that she was not acting in self-defense when the victim was shot. Alternatively, she

17

argues that even had she not been acting in self-defense, the evidence would at most support a conviction of manslaughter, not second degree murder. We disagree.

The evidence fully supports the finding by the jury that all the elements of second degree murder were established, as it was undisputed that Defendant shot the victim at close range in the head with a handgun. Thus, the sole question is whether the evidence was sufficient to establish that the killing was not justified as an act of self-defense.

The jury heard and saw evidence establishing beyond a reasonable doubt that the victim was not armed with any weapon when his body was found. By Defendant's own admission, the victim was not armed. In addition, according to the coroner's chief investigator, if the victim had been lunging at Defendant when he was shot, as Defendant urged, he would have fallen face first, yet this is not the position in which his body was discovered.

While Defendant knew that she had killed the victim, she hid this information from Ms. Andrepont, the victim's elderly aunt, who had raised him as her own child since he was a boy, allowing her to find the body. When CPSO deputies arrived, she continued to lie and deny any knowledge of or involvement in the events leading to the murder. Only after being confronted with irrefutable evidence of her lies about waiting for Ms. Andrepont in the hospital parking lot did Defendant begin to change her story, first alluding to a suicide, then admitting that she killed the victim but claiming self-defense. The vehicle she and Ms. Andrepont were in was seen by the LPRs going to the hospital at 12:57 p.m. and was again seen going towards the hospital at 1:53 p.m., which gave Defendant a time span of slightly less than one hour to get to the house, somehow get into a heated argument with the victim as she asserts, shoot him, secure the scene, and begin to drive back to the hospital. Video

18

footage from cameras at the hospital show that rather than staying in the parking lot as Defendant originally told CPSO deputies, she left the lot at 1:09 p.m. She returns to pick up Ms. Andrepont and then leaves the hospital with her at 2:15 p.m.

Simply put, Defendant's actions and denials are inconsistent with her own story of justifiable homicide. It is also inconsistent with the other evidence presented as to the nature of the past relationship between her and the victim. Ms. Andrepont, who lived with the two, testified that despite their verbal arguing at times, she never saw either strike, slap, or shove the other or saw any marks or bruises on them from physical abuse. In addition, Mr. Clark stated that while the victim was verbally abusive at times, he never saw him strike or hit Defendant, and that if he had he would have intervened. He did see the victim grab Defendant's arm and pull her on one occasion, but he did not intervene, nor did he contact the police about the incident. Finally, Ms. Lebrum testified that she saw the victim arguing and yelling at Defendant, and that they were fighting the night before the murder. However, her testimony was impeached by Detective Miller, who stated that she never informed him about the information she testified to when he interviewed her on January 21, 2021.

It is clear from the verdict that this jury simply did not believe Defendant's belated claim of justification by self-defense as it was not consistent with her known actions before and after the murder nor consistent with the scene of the crime. It is not our function on appeal to assess the credibility of witnesses or to re-weigh the evidence. *State v. F.B.A.*, 07-1526 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138. When presented with all the evidence, the jury here reasonably determined that Defendant did not have a reasonable belief that she was in imminent danger, and it found, beyond a reasonable doubt, that she

19

had the specific intent to kill the victim. Thus, her claim of an insufficiency of evidence has no merit. Having so concluded, Defendant's alternative claim that the evidence supports only a finding of guilt of manslaughter is rendered moot.

Defendant next asserts that a request to provide a jury instruction relative to the right to stand her ground and protect herself was denied by the trial court, which denial, she alleges, constituted error and deprived her of her right to a fair trial. We review this alleged error considering our finding that the evidence was sufficient to support the jury verdict rejecting the justification defense.

"The state and the defendant shall have the right before argument to submit to the court special written charges for the jury[,]" and "[a] requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent." La.Code Crim.P. art 807. Further, "[i]t need not be given if it is included in the general charge or in another special charge to be given." *Id.*

> A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. La.C.Cr.P. art. 807; *see also State v. Johnson,* 438 So.2d 1091, 1097 (La.1983); *State v. Lane,* 414 So.2d 1223, 1228 (La.1982). The charge, however, must be supported by the evidence. *State v. Teleford,* 384 So.2d 347, 350 (La.1980). This is a corollary of the trial judge's basic obligation to charge the jury as to the law applicable to the case, under which he is required to cover every phase of the case supported by the evidence whether or not accepted by him as true. La.C.Cr.P. art. 802; *State v. Simmons,* 422 So.2d 138, 141 (La.1982); *State v. Miller,* 338 So.2d 678, 679 (La.1976). Moreover, failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to substantial rights of the accused, or a substantial violation of a constitutional or statutory right. La.C.Cr.P. art. 921; *State v. Marse,* 365 So.2d 1319, 1324 (La.1978).

*State v. Perkins,* 13-1917, p. 2 (La. 9/3/14), 149 So.3d 206, 207–08.

20

The record reflects that while the trial was ongoing, Defendant sent an email to the trial court requesting that the jury be charged with the "stand your ground" law. The trial court heard brief arguments from both sides before denying the request for the instruction. In its oral ruling, the trial court stated the following:

> The Court will not be adding this jury instruction into -- not for the reasons stated by the State. But I think the justifiable homicide defense, which we've already put into the jury instructions, fits the circumstances. I do not feel circumstances, as the Court understands it, fits the stand your ground law. So for those reasons, I will not be including in [sic] the final jury instructions.

While Defendant objected to the ruling, nowhere in the record does there appear the special-requested jury charge proposed by her, only a general statement in argument about the "stand your ground law" appearing in the record. The email to the trial court referenced by Defendant is not of record. Presumably, Defendant is referring to the text of La.R.S. 14:20(C), and the request was to include the statutory provision, as written, in an instruction; however, the record does not make this clear.[7] Regardless, the trial court denied the request, finding that the "stand your ground" provision did not particularly fit the facts of the case and that the instructions to be given already contained an instruction regarding self-defense. That instruction given to the jury reads as follows:

> The defendant's conduct, otherwise criminal, is justified if she reasonably believes that she is in imminent danger of losing her life or receiving great bodily harm and that the killing is necessary to save herself from that danger.
>
> Thus, if you find: Number 1, that she reasonably believed that she is in imminent danger of losing her life or receiving great bodily harm; and that the killing was necessary to save herself from that danger; you must find the defendant not guilty.

---

[7] Louisiana Revised Statutes 14:20(C) provides: "A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force."

We find no error in the ruling given this record. The trial court was within its discretion in denying the request. Defendant did not establish how the charge specifically related to the facts or that any prejudice resulted from the failure to give the instruction. The jury was given the correct law pertaining to justifiable homicide and self-defense. Accordingly, Defendant's argument to the contrary lacks merit.

## Excessive Sentence

In her final assignment of error, Defendant argues that she was entitled to have the trial court rule on the unconstitutional excessiveness of a life sentence for this offense. She urges that the trial court made no effort to set forth any basis for the sentence of life imprisonment without benefit of parole, probation, or suspension of sentence.

> Whether a sentence is constitutionally excessive is determined by considering whether the sentence is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless infliction of pain and suffering. La. Const. art. I, § 20; *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); 977 *State v. Lindsey*, 50,324 (La. App. 2 Cir. 2/24/16), 189 So. 3d 1104. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *Id.*

> It is within the legislature's prerogative to determine the length of the sentence imposed for the crimes classified as felonies, and the courts are charged with applying these punishments unless they are found to be unconstitutional. *State v. Barrett*, 51,921 (La. App. 2 Cir. 4/11/18), 247 So. 3d 164, *writ denied*, 18-0744 (La. 2/18/19), 265 So. 3d 770. Accordingly, the decision to assess mandatory life sentences is also within the prerogative of the legislature. *Id.*

> Downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender and the circumstances of the case. *State v. Chandler*, 41,063 (La. App. 2 Cir. 9/8/06), 939 So. 2d 574, *writ denied*, 06-2554 (La. 5/11/07), 955 So. 2d 1277, *citing Dorthey, supra, and State v. Johnson*, 97-1906 (La. 3/4/98), 709 So. 2d

672. The "rare circumstances" in which a mandated sentence can be altered are even less likely in the case of a life sentence chosen by the legislature for a single crime, such as aggravated rape or second degree murder. *State v. Chandler, supra.* In such crimes, unlike the mandatory minimum sentence under the habitual offender law, the "tailoring" of the sentence by the legislature was for life because the culpability of offenders and the gravity of the offenses are so great. *Id.*

Likewise, where there is a mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence that it is legally required to impose. *State v. Barrett, supra.* It would be an exercise in futility for the trial court to discuss the factors enumerated in that article when the court has no discretion in sentencing the defendant. *State v. Robinson*, 47,437 (La. App. 2 Cir. 11/14/12), 106 So. 3d 1028, *writ denied*, 12-2658 (La. 5/17/13), 117 So. 3d 918.

*State v. Nabors*, 53,357, pp. 3–4 (La.App. 2 Cir. 4/22/20), 295 So.3d 974, 976–77, *writ denied*, 20-709 (La. 10/6/20), 302 So.3d 527.

Given the law applicable to the review of mandatory life sentences for second degree murder, we find that Defendant failed to rebut the presumption of constitutionality by showing clear and convincing evidence that she is exceptional, namely, that she is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. She did not negate the presumptive constitutionality of the legislature's considered decision to impose this sentence for the most serious of offenses. The trial court was not required to justify the imposition of this mandatory sentence although it did affirmatively state on the record that it saw no reason not to impose the life sentence given these facts. That was entirely within its authority and discretion under these circumstances. Accordingly, Defendant's assignment of error lacks merit.

23

## DECREE

Defendant's conviction for second degree murder is affirmed, as is her sentence of life in prison, without the benefits of parole, probation, or suspension of sentence.

**AFFIRMED.**